The People of the State of Illinois, Plaintiff-Appellee, v. Ernest Cloutier, Defendant-Appellant.

Gen. No. 49,876.

First District, Second Division.
October 19, 1965.

Emilie N. Wanderer, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Paul H. Knott, Assistant State's Attorneys of Cook County, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court.

This appeal comes from a conviction of voluntary manslaughter entered June 9, 1964 in the Circuit Court of Cook County, Criminal Division. The appellant urges as grounds for reversal that he was not proven guilty beyond a reasonable doubt and that certain evidence was not properly admitted at his trial. He was tried by the court, a jury having been waived.

The appellant is accused of killing one William Neiswander on Christmas night, 1963. Richard Watt, Neiswander's roommate, testified that the last time he saw

the deceased prior to December 25, 1963 was on December 22, at which time he was healthy and alive. Watt stated that on December 25 he returned to their apartment at 1430 North Dearborn, Chicago, and found Neiswander lying on the floor, and that the drapes in the apartment had been pulled down, a table broken and that lamps were on the floor. The witness identified two photographs which, he said, accurately portrayed the deceased and the room as he found them.

A police officer, Harold Grazer, took the stand and also identified the photograph of the deceased as a true and accurate portrayal of the body. Another police officer, Anthony Marubio, testified that on December 25, 1963, he and his partner, Patrick Touhy, arrived at the deceased's apartment just prior to midnight and observed that the furniture was damaged, that the curtain from the pullman kitchen. had been ripped loose, that there was blood all about the body of the decedent and that blood and fecal matter were on the walls. This witness also identified photographs of the deceased and of the apartment as true and accurate representation of the conditions he observed that night.

Officer Marubio further testified that he found portions of the deceased's clothing scattered throughout the apartment. He testified that when he saw the deceased, he was clothed solely in his T-shirt, shoes and stockings. Officer Marubio said that upon further search of the apartment, he found a key with a piece of string and a tab with the name of the Walton Hotel and a room number. During the course of the examination, this witness also identified a T-shirt and a frying pan which he described as being covered with blood when he found it in the living room of the deceased's apartment.

Officer Marubio then testified that he and his partner went to the Walton Hotel at shortly after 3 a. m. December 26 to the room the number of which appeared on the key tab found in the deceased's apartment. This

179

was the room occupied by the appellant. They knocked at the door and identified themselves as police officers, and were invited in by the appellant. The appellant gave the officers permission to search his room. In the dresser were found two T-shirts of the same size and manufacture as that found in the deceased's apartment. The search also revealed a pair of pants with what appeared to be blood on them.

The appellant was taken into custody, and Officer Marubio took a statement from him. This statement shows that it was made at 4:30 a. m. on December 26. In this statement, the appellant described the events of that night as follows:

"I left the house about 8:30 p. m. and went to Shey's bar and I stayed till about 11:30 p. m. and went to Jamies on Clark St. about 1100 or somewhere close to that, then this guy approached me. He asked me to come to his place because I had said I was tired. The guy tried to play a little bit and I disapproved and so I hit him, after I hit him I stomped on him and from then I went to bed and when I woke up about three hours later and shook him he did not move. So I got scared and left real fast. That's about all I went to the bar again and then went home until you guys got me."

Upon further questioning, the appellant related that the deceased had asked to be hugged and kissed. "I refused and hit the guy; I hit him a few times and kicked him a few." Appellant stated that he hit the deceased with his fist from three to five times and that he kicked him from three to six times. The statement then reads as follows:

"Q. You stated after you hit him and kicked him you went to bed and slept for about three hours and when you awoke you shook William Nieswander

180

and he did not move; did you have an opinion of his condition at this time?

"A. Well, I thought he was dead."

When asked in what part of the body he kicked the deceased, the appellant stated, "The head is where I kicked him, I placed my foot on his throat afraid he would scream."

Another statement was taken from the appellant approximately two hours later. This statement shows he was questioned by an assistant state's attorney, and the statement was taken by a court reporter, Paul Elsing. Officers Marubio and Touhy were also present when this statement was made. This statement is substantially the same as the one made earlier that morning. The appellant identified the T-shirt found in the deceased's apartment as being his. He described his condition on the evening in question as being "pretty stoned."

Paul Elsing, the shorthand reporter, testified that the transcript of the second statement was a true and accurate transcription and that he recorded everything that anyone said while he was present in the room.

The appellant took the stand in his own behalf and testified that he was 26 years old, that he was raised in an orphanage and that he was honorably discharged from the army after having served for three years. He said that he had come to Chicago to look for work as a laborer on about December 20, and that he was engaged to be married. During his examination he related the same facts he told on his two statements, but his direct examination also brought out other testimony not in his previous statements. He stated that when he refused to engage in homosexual relations with the deceased, the deceased attacked him with a frying pan and put his knee to appellant's groin. He testified that when he left the apartment, deceased was lying on the floor and was fully clothed. Appellant again stated that he either fell

asleep or passed out after the fight and before he left the apartment. He also testified that he was quite sure he did not close the door all the way when he left. He stated that the photographs used by the People did not represent the state of the deceased or of the apartment when he left. He said he did not think the deceased was dead when he left.

The appellant testified that while he made the two statements attributed to him, the officers told him not to go into the full details when he made the first statement. He said he was not given an opportunity to present all the facts surrounding the incident.

Officer Marubio was recalled to the stand and denied that he had ever told the appellant not to go into the full details of his story. He also testified that neither Officer Touhy nor the assistant state's attorney had told the appellant to leave details out of his statement. No objection was made to this testimony. It is undisputed between the parties that the deceased was about 5 foot 8 inches tall and weighed about 135 pounds. It is also undisputed that the appellant is 6 foot 1 inch tall and weighed about 195 pounds.

The appellant's first point of contention is that he was not found guilty beyond a reasonable doubt. It is claimed in his brief, "There was no analysis of the blood on the pants of the defendant to show that it was the blood of the decedent, so as to place the defendant in the affray wherein the bloodiness occurred; there was no proof that no other person had had access to the apartment of the decedent; there was nothing to establish conclusively that the T-shirt found at the scene was that of the defendant, inasmuch as this Honorable Court may well know that there is nothing unique about a T-shirt which would make its purchase limited to any one person."

██ As to the question of whether the stains on the appellant's pants were deceased's blood stains, we

note that on page 41 of the record the parties stipulated that the microanalyst for the Chicago Crime Laboratory examined the pants and determined that the stains were human bloodstains. We recognize that proof that the stains were human bloodstains does not establish that the stains were of deceased's blood type. No claim of error regarding this was specified in a post-trial motion. He cannot raise this point for the first time on appeal. People v. Touhy, 31 Ill2d 236, 201 NE2d 425 (1964). We also note that in his second statement, the appellant stated that the T-shirt found at the scene belonged to him.

■ As to the question of whether the People must prove that no one else had access to the apartment after the appellant left, we think that this is not the case. The appellant testified at the trial that he had beaten and kicked the deceased. In both of his statements made the morning of December 26, he said he thought the deceased was dead when he left the apartment. At the trial, appellant denied that he thought Neiswander was dead, but said he thought he was hurt. He further denied making that statement while he was being interrogated. We also point to that portion of the first statement where the appellant said he stood on Neiswander's neck with one foot and kicked him about six times in the head with the other foot as evidence of acts sufficient to support a conviction for voluntary manslaughter. It is clear that if the statements made by the appellant are admissible, there is more than enough evidence from which the trial court could determine the appellant's guilt of the crime charged. The trial court is surely not bound to believe the appellant's retelling of that night's events at his trial. The court need not have believed that the appellant was threatened with a frying pan or was attacked in any other way. In addition, the court could also have easily found that had the appellant been attacked he used more than necessary force to repulse the deceased. We point to the

fact that the appellant was 5 inches taller than the deceased and outweighed him by 60 pounds. We hold, therefore, that the finding by the court was not against the manifest weight of the evidence.

 The next question we shall consider is the admissibility of the two statements. The appellant argues that "The confession obtained from the defendant before his arraignment and while he was not represented by counsel should not have been received in evidence." The claim is not made that the appellant was coerced, but the thrust of the argument would seem directed to Escobedo v. Illinois, 378 US 478 (1964). That case dealt with the question of what amounts to an unconstitutional deprivation of the right to counsel. The Escobedo case was urged before the Illinois Supreme Court in People v. Hartgraves, 31 Ill2d 375, 202 NE2d 33 (1964). The Supreme Court there pointed out that in Hartgraves there was no evidence that the accused had asked to see an attorney. The Court continued, "We do not, however, read the Escobedo case as requiring the rejection of a voluntary confession because the State did not affirmatively caution the accused of his right to have an attorney and his right to remain silent before his admissions of guilt." It was never claimed at any point in this case that the appellant asked to have an attorney. That being so, the appellant cannot urge Escobedo as a basis for rejecting the statements which he made to the police officers. We hold that both statements made by the appellant were admissible.

 The appellant next objects to the reception into evidence of the photographs of the deceased and of the apartment. It is claimed that since the cause of death was stipulated to, there was no purpose in admitting these exhibits. The People claim that the photographs were of aid in determining the manner in which the fatal wounds were inflicted and in permitting the court to judge the amount of force used against the deceased

in evaluating the claim of self-defense. It is almost impossible for us to determine whether the photographs could have aided the court since they have not been included in the record on appeal. "Where the record is incomplete, a reviewing court will indulge every reasonable presumption in favor of the judgment or order. Any doubt arising from the incompleteness of the record will be resolved against the appellant." McGann v. Lurie, 15 Ill App2d 297, 300, 146 NE2d 223, 225 (1957). We are not in a position to say that the Court below was not aided in his understanding of the case by the use of the photographs offered in evidence by the People.

Having found no reversible error, we affirm the judgment of the Court below.

Judgment affirmed.

BURKE, P. J. and LYONS, J., concur.