THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KATHLEEN WILSON, Defendant-Appellant.

First District (2nd Division)    No. 79-2078

Opinion filed January 13, 1981.

Gerald A. Goldman, Chartered, of Chicago (Gerald A. Goldman, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Michael K. Demetrio, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Kathleen Wilson, was indicted for the murder of her four-month-old son, Reginald Wilson. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1.) Following a jury trial defendant was found guilty as charged and was sentenced to serve 20 years in the Illinois Department of Corrections. From that judgment defendant now appeals, presenting the following issues for review: (1) whether the trial court properly admitted into evidence a court reporter statement which defendant did not sign; (2) whether certain remarks of the prosecutors during closing argument constituted reversible error; and (3) whether autopsy slides revealing prior injuries to the deceased were properly admitted into evidence. For the reasons hereinafter set forth we affirm the judgment of the circuit court of Cook County.

Chicago police officer Joseph Barrett testified that on January 6, 1978, between 12 and 12:30 p.m. he and his partner, Joseph Bamberger, went to defendant's home in the course of an investigation into the death of her four-month-old son Reginald. The officers found defendant, whom Barrett identified in court, Reginal Silar,[1] who was defendant's common-law husband and father of the victim, and several young children. Investigator Barrett informed defendant and Silar that the officers were investigating the death of Reginald Wilson and advised them of their *Miranda* rights. The officers asked defendant and Silar to accompany them to Area 3 homicide where they were questioned separately. After again advising defendant of her *Miranda* rights, Barrett confronted her with the results of the autopsy performed on the body of Reginald Wilson and asked her if she knew what had happened to her baby. Defendant denied knowing how her child had been injured. Barrett left the interview room and returned about 45 minutes later (4 p.m.) with investigator Bamberger and Reginal Silar. Silar informed defendant that he (Silar) had told Bamberger what had happened to the baby: "I told him that you hit him." In response to Silar's accusation, defendant said that a couple of mornings earlier she had struck the child on the left side of the head.

---

[1] Although Silar spelled his name S-i-l-e-r, throughout the trial and on appeal his name has been spelled S-i-l-a-r. We follow that usage.

Officer William Melaniphy testified that on January 5, 1978, he and his partner Thomas Quinn went to defendant's home and were admitted by Silar. Defendant was lying asleep on the front room couch. Even by grabbing defendant and shaking her, neither Silar nor Melaniphy was able to awaken her. The officers left without speaking to her.

Assistant state's attorney David Weiner testified that on January 6, 1978, he interviewed both Reginal Silar and defendant, whom he identified in court. Weiner advised defendant of her *Miranda* rights and then took a 20-25 minute oral statement from her. In that statement defendant said that about 1 a.m., on January 3, 1978, she was awakened by her baby's crying. Although she had been drinking earlier in the day, she said she was alert when she woke up. Defendant went into Reginald's room, checked his diaper and then went to get a feeding bottle. When she returned, the child was still crying. Defendant told Weiner that she then struck the baby twice in the head with a partially closed fist. She demonstrated this to Weiner. The child quieted down and she gave him the bottle. Two days later she found that Reginald was not breathing normally. She called for an ambulance and tried to give Reginald artificial respiration. Because of his familiarity with the autopsy report, which indicated that Reginald had on some earlier occasion suffered broken ribs and a broken arm, Weiner asked defendant if Reginald had been injured the previous October. Defendant said that on October 1, 1977, when Reginald was approximately one month old, he rolled off the side of a bed onto the floor and broke his arm. She did not realize that he had been hurt until he became irritable. She and Reginal Silar then took the child to a hospital.

At the conclusion of the oral interview, defendant agreed to give a written court reporter statement. The court reporter, John Akouris, arrived about one hour after Weiner had completed the oral interview. Defense counsel objected to Weiner reading the statement to the jury on the grounds that Weiner did not take or transcribe the statement and that defendant did not sign it. These objections were overruled and Weiner read the statement (People's exhibit No. 1) to the jury.

In her statement defendant said that she had given birth to Reginald Wilson on September 6, 1977. She admitted that she had told Weiner earlier she had struck her child about 1 a.m. Tuesday morning, January 3, 1978, but added that it was accidental. Defendant said she had been drinking and was taking medication the night when her baby's crying awakened her. She was not fully conscious when she went to check on Reginald. Defendant said she examined his diaper, then walked into the bathroom to prepare his bottle. When she returned, Reginald was still crying and she struck him on the left side of the head with a partially closed fist. She said it was unintentional. Reginald continued to cry and

defendant hit him again on the left side of the head. The baby calmed down and defendant gave him his bottle. She burped him and then went back to bed. Defendant said that Reginal Silar was out buying cigarettes at that time and her older children were asleep. Defendant said she had no reason to strike Reginald other than the fact that he was crying. Earlier in the day defendant had consumed two glasses of Calvert gin and Coke.

Two days after she had struck her child on January 3, 1978, defendant heard him cry out. "It was a strange kind of cry, and somehow I think I knew that there was something the matter with him. I went into the room and he wasn't breathing." This was the first time since she had hit her baby on January 3 that she noticed anything wrong with him. Defendant tried to revive her baby, and Silar called an ambulance which transported them to Englewood Hospital. There a nurse told defendant her child had died. No one but defendant had struck Reginald on January 3.

Defendant said that on October 1, 1977, when Reginald was about a month old, she picked him up to change his diaper. She laid him on a bed, face down, but he kept turning over. She left him alone momentarily to get a washcloth and when she returned she discovered that Reginald had fallen off the bed and onto the floor. She did not immediately notice anything wrong with Reginald but later in the day she took him first to Englewood Hospital, then to Mary Thompson Hospital. Defendant denied that she was drunk on October 1, 1977, or that she had grabbed her baby by the arm. When Weiner asked defendant how her baby could have fractured his ribs, which defendant said she first knew about when Weiner told her, she said her five-year-old daughter had on two different occasions dropped the baby when she was playing with him. According to defendant, the baby was dropped from a height of approximately three feet. At this point in taking defendant's written statement, Weiner was informed that defense counsel, William Starke, was on the phone and wanted to speak with him immediately. After speaking with counsel, Weiner terminated the interview with defendant. The written statement was not shown to or signed by defendant.

Dr. Mitra Kalelkar testified that on January 6, 1978, she performed an autopsy on Reginald Wilson. The baby weighed 10 pounds. The external examination revealed no visible signs of trauma. In her initial examination, Dr. Kalelkar observed healed rib fractures (calluses) on both sides of Reginald's chest and identified People's exhibits Nos. 2 and 3 as slides of the fractured ribs. The tenth rib on the left side had been broken and the seventh and eighth ribs on the right side.

In her internal examination of the baby's skull, Dr. Kalelkar observed evidence of subgaleal (inner scalp) hemorrhaging in the left parietal region. In the same region she discovered a "T" shaped fracture of the

skull, three inches in length and one-half inch in the stem. Examination of the intracranial cavity showed a large amount of partially clotted blood in the subdural space. The pathologist identified People's Exhibit No. 4 as a photograph of the inside wall of the skull (calvarium). Microscopic examination of the brain tissue revealed three layers of bleeding of the dura, the covering of the brain which divides it into two hemispheres. The topmost layer of bleeding was indicative of very recent bleeding, 24 to 48 hours old. The second layer of blood was approximately one week old. The blood cells in this layer had already split and the blood cells were liquified. Finally, there was a third layer of clotted blood indicative of more remote bleeding, at least a month old. In Dr. Kalelkar's opinion, Reginald Wilson died of cranial cerebral injuries, more specifically, a fractured skull and bleeding within the meninges of the brain. Death would not have been instantaneous. Dr. Kalelkar testified that a blow from a partially closed fist could have caused the injuries resulting in Reginald's death. She testified further that an X ray of Reginald's left upper arm revealed a partially healed broken left humerus. She also expressed the opinion that a month-old baby could not roll over from its back onto its stomach or the reverse.

On cross-examination Dr. Kalelkar said the topmost, most recent bleeding could have been sustained from an injury inflicted within a period of up to three days. In answering a hypothetical question propounded by defense counsel, Dr. Kalelkar said that the skull fracture and evidence of recent bleeding could have been caused by the baby falling to a linoleum covered wood floor from a height of over six feet on January 2, 1978, at approximately 9 p.m. The third layer of bleeding could not have been caused by an injury sustained on December 23, 1977, but it could have been caused by one received on October 1, 1977. The second layer of bleeding could have been sustained by an injury of December 23, 1977. The broken bone and ribs were more likely to have been caused in October than in December, but they could have been sustained any time in October or November.

Following Dr. Kalelkar's testimony, the State and defense stipulated that if Dr. Maglani were called to testify he would state that he pronounced Reginald Wilson dead in the emergency room of Englewood Hospital at 4 a.m. on January 5, 1978. They stipulated that defendant was 30 years old and that she had given birth to Reginald on September 6, 1977. Finally, the State and defense stipulated that if John Akouris were called to testify, he would state that he took down the statement defendant gave Weiner in the presence of investigator Melaniphy and that People's exhibit No. 1 truly and accurately reflected the questions asked and the answers given. All exhibits, including the court reporter statement and the X rays of the child's fractured ribs, were admitted into evidence

without objection. None was made part of the record on appeal, and the statement was not taken into the jury room during deliberations. With this, the State rested its case-in-chief.

The first witness to testify in the defendant's behalf was Reginal Silar. Silar testified that as of January 5, 1978, he had been living with defendant and her children for two years. Reginald Wilson was the child of defendant and Silar. Around 9 p.m. on January 2, 1978, Silar was playing with Reginald, lifting him up in the air above his head, when the baby slipped out of his hands and hit the linoleum floor. The baby fell on its left side and his head also hit the floor. Silar picked him up and put him to bed. He did not tell defendant what had happened to their child. Silar testified that he had told this to the police on January 6, 1978, at Area 3 Homicide. An officer said he would have to check it out with the pathologist. When he returned, the officer said nothing directly about charging Silar but wrote "Murder One" on a scratch pad. After the officer wrote this, Silar went into defendant's interrogation room and told her to tell the police that she had slapped her baby, Reginald. Silar said that he told defendant he was on parole and that he would be "open game" for the other inmates if he went to the penitentiary on a charge of murdering a child. After defendant agreed to do this, Silar stepped out of the interview room and told the police that defendant had admitted to him that she had slapped her baby. He then repeated this accusation in her presence.

Silar said that on October 1, 1977, he took defendant and Reginald to Mary Thompson Hospital after Reginald had rolled off a bed and hurt his arm. At the hospital a cast was put on the baby's arm. At no time in his relationship with defendant did Silar see her strike Reginald or any of her other children, although on occasion she would hit them with a belt.

Tracee Wilson, defendant's seven-year-old daughter, testified that on December 23, 1977, she heard Reginald crying and went into his room to check on him. When she picked him up from his bed, he slipped through her hands and hit his head on the floor. Tracee told her brother David what had happened and he ran downstairs to get his mother. Tracee said his mother picked the baby off the floor and put him to bed. On cross-examination Tracee demonstrated how she had dropped Reginald. Another of defendant's children, David, testified to substantially the same facts except that he said he and not his mother put the baby back in bed.

Taking the stand in her own behalf, defendant testified that on January 5, 1978, Reginal Silar woke her up and told her something was wrong with her baby, that he had stopped breathing. She told Silar to call the fire department and tried to revive Reginald. The ambulance transported the child to Englewood Hospital where he was pronounced dead. Defendant said that when she was taken in for questioning on January 6

she told investigator Bamberger that her baby had died from sudden infant death syndrome. When the officer confronted her with the results of the autopsy which indicated a skull fracture as the cause of death, defendant said she did not know how that had happened. Nor did she know anything about his broken ribs. She denied having done anything to her baby. After this initial confrontation, Reginal Silar came to her interview room and when no one else was present told her that if she would agree to tell the police that she had slapped the baby a couple of times accidentally, then the police would not charge him with murder. Silar was afraid that his parole would be revoked and that his life would be in danger if other prisoners thought he had killed a baby. Initially defendant refused to go along with this idea but gave her consent when Silar assured her that she would not be charged either. It was then that Silar first told defendant that he had dropped Reginald when he was playing with him. When Silar returned with the police, he told them she had agreed to tell them she had slapped her baby "because I had—this is what had happened."

Defendant testified that on October 1, 1977, she heard Reginald crying. She laid him on his bed and checked his diaper which was wet. While she was in the bathroom getting a washcloth, she heard him crying. When she got back to the room, Reginald was on the floor. She did not immediately notice anything wrong with Reginald but took him to Englewood Hospital when he showed signs of irritation. A nurse at the hospital informed defendant that because of a more pressing emergency she would have to take her child to another hospital. Defendant said she took Reginald to Mary Thompson Hospital. On December 23, 1977, her son David came downstairs and told her that Tracee had dropped the baby. She found him back in bed and checked him. She denied beating or killing her son or striking him at any time.

On cross-examination defendant said that before October 1, 1977, she had never seen her baby roll over in his bed. When she took her child to Mary Thompson Hospital, she spoke with nurses and physicians in the emergency room. Reginald was hospitalized for a week and a half with a broken arm. X rays were taken but none of the staff informed defendant that Reginald had suffered any injuries other than a broken arm. After Tracee dropped Reginald on December 23, 1977, defendant took him to the emergency room at Englewood Hospital for treatment. The hospital personnel told her they could find nothing wrong with Reginald and took no X rays. Defendant could not recall telling Weiner that she had hit Reginald twice or demonstrating how she had struck him. Although Silar had informed defendant that he had dropped, not slapped, the baby, she did not ask him why he asked her to tell the police she had slapped him.

The State called eight witnesses in rebuttal. Dr. Helene Noumann,

chief radiologist at Mary Thompson Hospital, testified that she had taken 11 X rays of Reginald Wilson on October 1 and 3, 1977. An X ray of Reginald's left arm revealed a displaced diagonal fracture of the left humerus. X rays of the chest and skull disclosed no fractures or other abnormalities. Dorothy Petrick, a caseworker for the Illinois Department of Children and Family Services, testified that in a conversation with defendant on October 6, 1977, defendant denied that Reginal Silar was living with her. Petrick said that one of defendant's children, David Wilson, told her on January 6, 1978, at Area 3 Homicide that his mother constantly drank and fought with Silar and that they threw things around. Whenever this occurred, all the children except the baby would hide in their bedrooms. David Weiner returned to the stand and testified that Silar had told him that on October 1, 1977, defendant had grabbed her baby when she was drunk. Weiner testified further that Silar had said defendant had been drinking for several days before Reginald was injured in January.

The fourth rebuttal witness was assistant state's attorney Phillip Mitchell. Mitchell testified that he interviewed Silar before Silar took the stand. In their conversation Silar stated that he had dropped the baby not on January 2, 1978, but in December, some time before Christmas, and that he had never dropped him before or after that one occasion. Silar said he was sitting on the edge of a bed and accidentally dropped the baby on the floor. According to Silar, the baby hit its side, not its head, on impact. The police had never threatened to charge him with Reginald's murder. Investigator Melaniphy testified that when he went to defendant's home on January 5, 1978, defendant was asleep and could not be awakened. Silar told Melaniphy that before going to sleep that night defendant had consumed a half quart of vodka and some pills. Dr. Mohini Khurana testified that he was the emergency room physician at Mary Thompson Hospital on October 1, 1977, when defendant and Silar brought Reginald in for treatment. In Khurana's opinion defendant was under the influence of alcohol at the time. Dolores Hollingsworth, director of medical records at Englewood Hospital, testified that there was no record of Reginald Wilson having been treated or examined in the emergency room of the hospital between December 20 and 24, 1977.

The last witness to testify in rebuttal was Dr. Katherine N. Vedder, attending physician in charge of the training program in pediatrics and chairman of the protective services team of Cook County Children's Hospital. Dr. Vedder described the injury to Reginald Wilson's left arm as an oblique fracture, i.e., one which does not run perpendicular across the bone but on an angle. This type of fracture can be sustained only by a twisting force. In Dr. Vedder's opinion it would have been "extremely unlikely" for Reginald's injury to have occurred in a fall off a twin bed

onto a bare floor. She testified further that it would be next to impossible for Reginald to have suffered injuries to both his right and left ribs and to his head in a fall from the arms of a six-year-old child. And it would be highly unlikely for a four-month-old child to experience a subdural hematoma by rolling off the side of a bed onto a linoleum floor. It is possible that such an injury could have been sustained by the child falling on the bed and then rolling off the bed onto the floor. In Dr. Vedder's opinion the injury causing Reginald's death could have been sustained by a severe blow to his head. The blow would probably not have caused either abrasions or lacerations.

At the conclusion of the rebuttal testimony the State and defense stipulated that on April 28, 1975, Reginal Silar had been sentenced to serve a year to a year and a day in the penitentiary following his plea of guilty to robbery. He was paroled on August 22, 1975, and was still on parole as of January 6, 1978. Both sides then rested. Defendant was found guilty of murder and was sentenced to serve 20 years in the Department of Corrections.

## I.

Defendant's first assignment of error is that the unsigned court reporter statement she gave to assistant state's attorney Weiner could be introduced into evidence only under the past recollection recorded exception to the hearsay rule. Since the preliminary foundation questions necessary for admission of the statement on this basis were never asked, defendant argues that its admission into evidence was improper and prejudicial. The People respond that defendant has waived this error by not raising this specific objection when the statement was first offered and by not alleging it in her post-trial motions. The People state further that on its merits defendant's argument misapprehends the nature of the statement itself which, as an admission, was not excludable as hearsay.

When the State attempted to have Weiner read defendant's statement (People's exhibit No. 1) to the jury, defense counsel objected on two grounds: (1) Weiner himself did not transcribe or physically produce the statement, and (2) the statement was not signed by defendant. These objections were overruled and Weiner published the statement to the jury. Defendant did not renew these objections in her written motion for a new trial or in argument thereon. Nor did she raise any other objections to the statement. Relying on *People v. Fain* (1976), 41 Ill. App. 3d 872, 355 N.E.2d 61, the People maintain that by not raising this point in her written motion for a new trial, defendant has waived it on appeal. Furthermore, we are urged not to consider defendant's contention because the specific objection raised on appeal was not presented at trial. *People v. Robinson* (1974), 20 Ill. App. 3d 777, 314 N.E.2d 585.

■■ As a general principle errors not specified in a written motion for a new trial are waived. (*People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76.) The central purpose of this doctrine is to enable the reviewing court to have the benefit of the trial court's judgment. (*Irwin.*) When the matter has in some manner been brought to the attention of the trial court, as it was here by defendant's objection at trial, the reviewing court may, in its discretion, consider the issue on its merits. (*People v. Whitley* (1977), 49 Ill. App. 3d 493, 500, 364 N.E.2d 511.) Because of the evidentiary significance of defendant's unsigned court reporter statement, we believe it is appropriate to reach the merits of defendant's allegation of error.

■■ Defendant argues that her statement was admissible only under the past recollection recorded exception to the hearsay rule and that the preliminary foundation questions necessary for admission on this ground were never asked. As the People correctly point out, this argument is premised on the assumption that defendant's statement was hearsay. The hearsay rule is not a basis for objection, however, when an opponent's assertions are offered against her. In such case her assertions are termed admissions. An admission is a statement of independent facts which, when taken in connection with proof of other facts, may lead to an inference of guilt of the crime charged but from which guilt does not necessarily follow. (*People v. Walters* (1979), 69 Ill. App. 3d 906, 919, 387 N.E.2d 1230.) "Extrajudicial admissions made by a party opponent are not excludable as hearsay." (*People v. Simpson* (1977), 68 Ill. 2d 276, 282, 369 N.E.2d 1248; *People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592.) In *Simpson* our supreme court referred to Federal Rule of Evidence 801(d)(2), which excludes from the definition of hearsay admissions by a party opponent. By that definition defendant's statement was not hearsay and, therefore, its introduction into evidence did not have to be based on any recognized exception to the hearsay rule. Under traditional evidence law, an admission is recognized as a distinct exception to the hearsay rule. (*People v. Montgomery* (1974), 18 Ill. App. 3d 828, 832-33, 310 N.E.2d 760.) Thus, whether defendant's statement, as an admission by a party opponent, is viewed as nonhearsay or as an independent exception to the hearsay rule, its admissibility did not depend upon meeting the requirements of the past recollection recorded exception to the hearsay rule. Defendant's citation of *Noumoff v. Rotkvich* (1967), 88 Ill. App. 2d 116, 232 N.E.2d 107, which did not involve an admission by a party opponent is, therefore, inapposite.

■■ The real thrust of defendant's argument, apparently, is that a defendant's *unsigned* statement cannot be read to the jury but must be recalled from the independent recollection of a witness who heard it. This was trial counsel's objection. The fact that defendant's statement was not signed did not, however, render it inadmissible. (*People v. Berryman*

(1958), 13 Ill. 2d 229, 231, 148 N.E.2d 745; *People v. Dogoda* (1956), 9 Ill. 2d 198, 202, 137 N.E.2d 386.) Weiner testified that the statement was a true and accurate record of the questions he asked and the answers defendant gave. The State and defense stipulated that if the court reporter were called to testify he would authenticate the exhibit. With this foundation the statement was admissible even though it was unsigned. (*People v. Perkins* (1959), 17 Ill. 2d 493, 500, 162 N.E.2d 385.) In *People v. McNeil* (1968), 99 Ill. App. 2d 273, 279, 240 N.E.2d 721, the court specifically rejected the argument that a defendant's written statement containing incriminating admissions was inadmissible as an unsigned hearsay document.

## II.

Defendant raises three arguments regarding the prosecutors' closing arguments: (1) that the prosecutor improperly stated that defendant's presumption of innocence has been taken away; (2) that the prosecutor made statements not supported by the record which prejudiced defendant; and (3) that the prosecutor attempted to inflame the jury's passions. We will consider these arguments seriatim.

## (1)

In closing argument assistant state's attorney Iavarone made the following comments:

"The defendant is presumed innocent. It's a presumption everyone is entitled to, but it is there to protect the innocent, ladies and gentlemen. It is not there to be used by the guilty so they can get off of what they do and flaunt the law. She has been proven guilty. The evidence has taken the presumption away.

I suggest to you that as each witness testified, that coat of innocence has been pulled away until she sits there, as she is now, a murderer.

[Defense Counsel] Mr. Starke: Objection.

The Court: Sustained.

Mr. Iavarone: You have been sitting across from her for the last—

Mr. Starke: Objection.

The Court: Sustained.

The jury is instructed to disregard that comment. The defendant is presumed to be innocent.

Mr. Iavarone: Yes, Judge, but I suggest that the evidence has taken away that presumption, and I suggest that during your deliberation, you will find that she is guilty, and you will realize that she has been a murderer since she has been sitting there.

Mr. Starke: Objection.

The Court: Objection sustained.

Mr. Starke: Thank you, Judge. Instruct the jury to disregard these remarks.

The Court: The jury is instructed to disregard the last remark."

■■ These comments by the prosecutor were improper. A defendant is entitled to the presumption of innocence at all stages of a trial (*People v. Matthews* (1979), 69 Ill. App. 3d 65, 66, 387 N.E.2d 10), including the period during which the jury is considering all the evidence after receiving instructions by the court and until the jurors determine from such evidence that guilt has been established beyond a reasonable doubt (*People v. Long* (1950), 407 Ill. 210, 213, 95 N.E.2d 461.) The comments in the case at bar may not, in our opinion, be construed as a "valid urging as to the defendant's guilt," as the State contends. We must, therefore, consider what effect they may have had upon the jury.

Here, defense counsel promptly objected to the prosecutor's remarks. The objections were sustained and the court admonished the jury to disregard them. The court immediately instructed the jury that defendant was presumed innocent, and it repeated the instruction in more detail before the jury began deliberations. As our supreme court noted in *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233, if a timely objection is made at trial to an improper remark by counsel to the jury, the court can, by sustaining the objections or instructing the jury to disregard the remark, usually correct the error. We believe that in this instance the trial court's prompt response to the prosecutor's comments corrected the error. Although the comments were improper, they were not of the magnitude of those present in *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432, cited by defendant. There the prosecutor told the jury on over 20 occasions in closing argument that defendant had the burden to present evidence creating a reasonable doubt of her guilt and that she had failed to do so. In the case at bar the prosecutor never argued to the jury that defendant had the burden of proving her innocence. What he said on two occasions was that the evidence had removed the presumption of her innocence. This, as we have said, was improper. Nevertheless, the remarks complained of fall far short of those which led to the reversal of the defendant's conviction in *Weinstein*.

In *People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903, the supreme court held at page 587 that the prosecutor's statement in closing argument that the presumption of innocence had been "stripped away" from the defendants did not deprive defendants of their right to a fair trial where no objection was made at trial and where the statement was followed almost at once by the standard jury instruction on the presumption of innocence and burden of proof.

In *People v. Kurena* (1980), 87 Ill. App. 3d 771, 781, 410 N.E.2d 228, the prosecutor made the following remarks:

"* * * the presumption of innocence is not here to shield somebody that's guilty. It's to protect innocent people. Just keep that in mind in your deliberations, because every bit of evidence that we have put forth, and every bit of evidence that that man put forth on behalf of his client had helped take down that presumption of innocence, break down that presumption, brick by brick until there is no presumption of innocence at this point."

These comments, virtually indistinguishable from the ones in the case at bar, were held to constitute harmless error where the trial court properly instructed the jury as to the presumption of innocence.

### (2)

Defendant also complains of several statements which she says were not supported by the record. During argument Mr. Iavarone said that defendant "hit him [Reginald] in the head at least on three different occasions and punched him in the ribs." He also stated that defendant had "hit him before." Defendant claims that these remarks were not based on any evidence brought out at trial and that it was highly prejudicial. Resolution of this argument requires us to consider the testimony presented by both the State and defendant.

The autopsy performed on Reginald Wilson's body showed that on separate occasions Reginald had sustained three injuries to his skull, three fractured ribs and a broken left arm. Defendant admitted to the police and to an assistant state's attorney that early in the morning of January 3, 1979, she had struck her child twice on the left side of the head with a partially closed fist. In Dr. Kalelkar's opinion the blows described could have caused the fractured skull which resulted in Reginald's death. At trial defendant testified that she had never struck her baby and introduced testimony in an effort to explain the injury to the child's head and the other injuries. Both the impeachment of defendant's witnesses and the rebuttal testimony presented by the State tended to cast doubt on defendant's explanations, and the prosecutor could legitimately argue the improbability of those explanations in his summation to the jury. Although there was no direct evidence linking defendant to her child's previous injuries, and the prosecutor's comments would have been better left unsaid, we are unable to conclude that defendant suffered any substantial prejudice thereby.

Dr. Vedder testified that it was "extremely unlikely" that the spiral fracture of the child's left arm could have been caused by falling off defendant's bed. When, in referring to this testimony, Mr. Iavarone said that it was "impossible" for the baby to have broken his arm in this

manner, defense counsel immediately objected, and the objection was sustained. Any error in the prosecutor's comment was, in our opinion, cured by the trial court's action. Moreover, we would note that another expert witness, Dr. Kalelkar, expressed an unqualified opinion that a four-week-old child could not roll over from its stomach onto its back or the reverse.

■■ Finally, defendant complains of the prosecutor's comment that defendant had told the police "I hit him. I hit him twice, and I killed him." Although defendant did admit that she had struck blows which, as the expert testimony showed, could have caused the injuries which resulted in Reginald's death, she never said "I killed him." This remark by the prosecutor misstated the evidence and was grossly improper. The remark does not appear to have been an honest mistake in the interpretation of the evidence. As stated in the American Bar Association's standards relating to the prosecution function, "The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it might draw." (ABA Standards, The Prosecution Function §5.8 (1974).) In attributing this statement to defendant, Mr. Iavarone far exceeded the boundaries of permissible comment. He would be well advised to remember that every defendant, regardless of the nature of the proof against him, is entitled to a fair trial. Based on our review of the evidence, however, we cannot say that the verdict would have been different had this remark not been made. [2]

In *People v. Allen* (1959), 17 Ill. 2d 55, 63, 160 N.E.2d 818, the supreme court held that although it was improper for the State's attorney to refer in his opening statement to evidence of admissions made by a defendant which were never thereafter proved at trial, the reference did not constitute reversible error where there was positive evidence of his guilt. Relying upon *Allen*, the court, in *People v. Cain* (1979), 70 Ill. App. 3d 1, 7, 388 N.E.2d 54, has observed that "even such inflammatory remarks as a reference to an admission of guilt by the defendant to the offense for which he is being tried where no such admission is proved at trial will not require reversal where there is no reasonable ground to believe that the jury's verdict was influenced by these remarks." In the case at bar defendant did make several admissions, but she never said, "I killed him," as Mr. Iavarone stated in his closing argument. Defense counsel objected to this statement, and the court said, "the jury heard the evidence." Before the jury retired to deliberate, the court instructed it that

---

[2] Although "reprehensible trial conduct will not result in reversal if the prejudicial impact is not material to the outcome," (*People v. Carbona* (1975), 27 Ill. App. 3d 988, 1011, 327 N.E.2d 546), our supreme court has warned that in cases where reversal is not required "disciplinary action against offending counsel may be the only effective deterrent." *People v. Butler* (1974), 58 Ill. 2d 45, 52, 317 N.E.2d 35.

closing arguments were not evidence and any statement not based upon the evidence should be disregarded. In *People v. Pickett* (1976), 35 Ill. App. 3d 909, 914-15, 342 N.E.2d 766, the prosecutor, in closing argument, used the words "confession" and "admission" in characterizing statements defendant had made to the police. The court held that the error in making these references was cured by defense counsel's objection, which was sustained, and by the court's instruction to disregard the remarks.

Considering the strong evidence of defendant's guilt, we are not persuaded that the comment complained of could have influenced the jury's verdict. Defendant told the police that early on the morning of January 3, 1978, she hit her child on the left side of his head. In her oral and court reporter statements to the assistant State's attorney, defendant admitted that she had struck her child not once, but twice, on the left side of his head with a partially closed fist. At the prosecutor's request, defendant demonstrated how she had punched her child. The expert medical testimony proved that the blows which defendant described could have caused the fractured skull and bleeding in the meninges of the brain which resulted in the death of his four-month-old baby. Although at trial defendant offered an explanation for her admissions which was consistent with her theory of innocence, that explanation was materially impeached on cross-examination and further discredited by the rebuttal testimony presented by the State. Defendant herself does not dispute the sufficiency of the evidence to support the verdict of murder. From our review of the evidence we conclude that had the prosecutor's remark not been made, the jury's verdict would not have been different.

(3)

Defendant's third and final argument regarding the closing argument was that assistant state's attorney Dernbach improperly accused defendant of trying to blame her daughter Tracee for the death of Reginald Wilson.

In the court reporter statement defendant gave David Weiner she attempted to explain her baby's broken ribs by saying that Tracee had dropped him when she was playing with him. At trial defendant, her son David and Tracee all testified that on December 23, 1977, Tracee had dropped the baby while she was holding him. This testimony was introduced not to explain the rib injuries, which were more likely to have been sustained in October or November 1977, but the second layer of bleeding in the dura. The rib injuries were not present in October 1977 when Reginald was taken to Mary Thompson Hospital for a broken arm. They had to have been sustained at a later date. Dr. Vedder testified, however, that it was next to impossible for Reginald to have suffered

fractures to ribs on both sides of his chest and an injury to his head in a fall from the arms of a six-year-old girl.

Our review of the evidence indicates that although defendant was not trying to attribute the cause of Reginald's death to any accident involving her daughter, she did present evidence that some of Reginald's injuries, including one of the injuries to his head, were a result of Tracee's mishandling of the child. The State introduced rebuttal testimony to dispute this, and the prosecutor was within the bounds of proper comment in arguing the improbability of defendant's explanation and urging the jury not to accept them.

Defendant also presented evidence that she had not abused or beaten any of her children. Defense counsel stressed this in his closing argument. The prosecutor responded "that's like if I took a gun and shot one at you, you have to find me innocent because I didn't shoot the rest of you." An objection to this remark was immediately sustained, and we do not believe the comment prejudiced defendant.

In arguing that the closing argument of the prosecutor constituted reversible error, a defendant must show that the questionable language, considered in light of all the evidence of guilt, was a material factor in the conviction and that the verdict would have been different had the language not been used. (*People v. Smith* (1972), 6 Ill. App. 3d 259, 263, 285 N.E.2d 460.) Based on the evidence in this case we cannot say that the errors complained of, considered separately or in the aggregate, were material factors in defendant's conviction.

### III.

In her final argument defendant claims that she was prejudiced by the admission into evidence of two slides which Dr. Kalelkar used in illustrating her testimony that Reginald Wilson had suffered three fractured ribs. In her extremely abbreviated argument on this point defendant contends that she was prejudiced because the injuries depicted were never linked to the cause of Reginald's death and could not be attributed to defendant. The People argue that defendant has waived this issue by not objecting to the slides when they were introduced into evidence and that in any event the slides were not prejudicial.

At trial defendant did not object to Dr. Kalelkar's use of the slides in explaining her testimony. She did not object when the slides were received into evidence or when they were sent back to the jury during deliberations. The slides were not mentioned in defendant's written motion for a new trial or in argument thereon. In *People v. Aldridge* (1979), 68 Ill. App. 3d 181, 187, 385 N.E.2d 396, *aff'd* (1980), 79 Ill. 2d 87, 402 N.E.2d 176, the court held that defendant's argument that the trial

court should not have allowed autopsy slides into evidence had been waived as an issue on appeal where the evidence was not objected to at trial and no issue concerning it was raised in the post-trial motion. Here, defendant urges us to consider this claim of prejudice under the plain error rule. The admission into evidence of autopsy slides, however, has not been viewed as plain error. *Aldridge.*

■■ In the case at bar it is impossible for us to assess the allegedly inflammatory nature of the slides because defendant has failed to include them in the record on appeal. The purpose of a review is to evaluate the record of the trial court proceeding and in general the review will be limited to what appears in the record. (*People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 503-04, 292 N.E.2d 387.) The responsibility for the proper preservation of the proceedings before the trial court rests upon the defendant. (*People v. Smith* (1969), 42 Ill. 2d 479, 483, 248 N.E.2d 68.) For these reasons a question not presented by a record will not be considered on review. (*People v. Benford* (1975), 31 Ill. App. 3d 892, 895, 335 N.E.2d 106.) In *People v. Cloutier* (1965), 64 Ill. App. 2d 177, 212 N.E.2d 266, the court declined to review the defendant's contention that photographs of a murder victim should not have been received into evidence. When the appellant is responsible for the incompleteness of the record in an appellate court, the reviewing court will indulge in every reasonable presumption favorable to the conclusion reached by the trial court. Any doubt arising from the incompleteness of the record will be resolved against the appellant. (*People v. Spellman* (1978), 58 Ill. App. 3d 648, 651, 374 N.E.2d 1034.) It is defendant's responsibility to present a record of sufficient completeness so that her claim of prejudice may be knowledgeably considered.[3] She has not met this responsibility, and in the absence of a complete record we must presume that the slides were properly received into evidence. See *People v. Rode* (1978), 57 Ill. App. 3d 645, 647, 373 N.E.2d 605.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P. J., and STAMOS, J., concur.

---

[3] We note in this regard that defendant's claim of prejudice extends only to the slides themselves and not to the forensic testimony which they purportedly depicted.