THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY RAY MIMS, Defendant-Appellant.

First District (4th Division)   No. 1—87—3376

Opinion filed September 20, 1990.

Randolph N. Stone, Public Defender, of Chicago (Scott J. Frankel and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Jane E. Loeb, and Tyra H. Taylor, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Following a jury trial, defendant, Johnny Ray Mims, was found guilty of criminal sexual assault and sentenced to six years in the Illinois Department of Corrections.

On appeal, defendant argues that he should be granted a new trial because the court committed plain error by: (1) allowing the victim's sister to relate a conversation she had with the victim the day after the alleged rape; (2) admitting into evidence an unsigned transcription of defendant's inculpatory statements; and (3) ruling that evidence of prior misdemeanor offenses could be used to impeach defendant if he exercised his right to testify in his own defense.

We affirm.

BACKGROUND

The complaining witness, Rosalind H., testified at trial that she first met defendant on July 4, 1986, when he spoke to her from a car as she walked down the street near her home. The following day, defendant drove by Rosalind's residence and invited her to join him at the Taste of Chicago. He left when she declined.

Four months later, on October 20, 1986, defendant stopped by her house. Rosalind spoke with him for 20 to 25 minutes. When he invited her to ride with him to pick up a friend who lived nearby, she declined, stating that she was "waiting for somebody." He persisted, and she eventually agreed to accompany defendant to his friend's house. They went to pick up Oliver Foster, who asked defendant to return later because he was not yet ready.

Defendant then told Rosalind that she could go with him to "pick up some packages" which contained marijuana. The first attempt to buy marijuana failed and defendant told Rosalind he needed to go to his house to get more money. Defendant drove home and stayed inside for 30 minutes while Rosalind remained in the car. She complained about the time it had taken when defendant returned to the car, but agreed to drive with him to another location so that defendant could purchase marijuana. After they did so, defendant drove back to pick up Foster. When Foster told defendant he still was not ready, Rosalind agreed to go to the park with defendant to smoke some marijuana. On the way, defendant bought a 40-ounce bottle of Red Bull beer.

Instead of going to the park, defendant took Rosalind to a "gravel-like abandoned road" behind the park. No one was around and there were no lights. Defendant rolled a joint and drank some beer. Rosalind testified that she did not drink alcohol. She did accept the marijuana cigarette, however, stating that she "pulled on it" and gave it back. Then she told him she wished to go home.

Defendant put his arm around her, asking what was wrong. She moved away, stating that she was "not into touching." He became aggressive, grabbing her wrist and swinging his body over upon her. He pinned her hands to her side. She struggled with defendant, who told her to calm down and he would release her.

She struggled with him until they fell out of the car. She got up to run but he grabbed her from behind and they fell. She screamed and he covered her mouth, twisting her arm. He asked if she were "crazy" and told her to be quiet because he had a lot to lose.

Rosalind further testified that he forced her back into the car and shoved her into the back seat. He got on top of her. She was screaming but stopped after defendant threatened to burn her with a light bulb he

took from the car. She testified that she was frightened.

Defendant then sexually assaulted her, partially undressing her and forcibly engaging in sexual intercourse with her. During the attack she turned her head to the side and she was crying. Defendant then told her to get up and allowed her to pull up her underwear. She testified that he kept telling her to stop crying and that he was sorry. He said he did not mean to do what he had done. He also told her he always got what he wanted.

Defendant then drove Rosalind home, stopping first to pick up his friend, Foster. Rosalind did not say anything to Foster or defendant during the drive. She sat as far from defendant as possible, staring straight ahead and saying nothing. When he dropped her off at her house she jumped out and defendant followed her, saying that he would see her the next evening.

Rosalind went inside, telling her mother "nothing" when asked what was wrong. She testified that she was frightened and ashamed. Rosalind went into her sister's room, woke her up, and began crying. She told her sister, Deborah H., that "something happened" with defendant and said she would talk about it later.

The next morning Rosalind and Deborah went on an errand. Rosalind told Deborah the details of the attack and Deborah persuaded her sister to tell their mother what had happened. The victim's mother, Rosa H., took her daughter to the police station, along with the clothes she had been wearing the night before.

Two days after the assault, Rosalind identified defendant by selecting his photograph from several others.

At trial, Rosa testified that her daughter was crying when she returned home on October 20 and that her dress was torn. Rosalind appeared tense and shaking but did not want to talk.

Deborah, the victim's sister, corroborated the testimony of Rosa and Rosalind. She testified that Rosalind had come into her room that night and then gave her the details of the attack the following day.

Oliver Foster, defendant's long-time friend, also testified for the State. He corroborated Rosalind's testimony regarding the number of times defendant went to pick him up. When he got into the car with defendant and Rosalind, he sat in the back seat. He noticed that Rosalind was "quiet and distant" when defendant leaned over to speak to her and that she stared straight ahead. When she jumped out of the car at her house, defendant followed her and spoke to her, but Foster could not hear the words. She seemed to be in a hurry to get to the house. Then Foster and defendant drove to Foster's house and talked. Defendant told Foster that Rosalind did not want to have sex with him but that

"eventually they had sex." According to Foster, defendant characterized the whole incident as "scary."

Other evidence indicated that the seminal material in the victim's panties could have been defendant's, that the police found a 40-ounce bottle of Red Bull from the crime scene, and that an officer had found at the scene a letter addressed to defendant.

Defendant agreed to be interviewed and waived his *Miranda* rights before speaking to the police.

According to the testimony of a police detective and an assistant State's Attorney, defendant admitted to them that Rosalind did not want to leave with him but that he persuaded her to, and that they went to buy marijuana and beer. He drove her to the gravel road and he began making advances, which were not accepted or returned. He persisted anyway. Rosalind told him to stop but he continued because he was sexually excited. She jumped out of the car, falling in the process, and started screaming. He put his hand over her mouth, telling her to stop screaming and that he had a lot to lose. He told her to get into the back seat and they would have sex, which they did. Then they drove to Foster's house at about midnight. Defendant claimed that Rosalind told him to come by the next day.

Defendant consented to the search of his car. No clear prints were lifted from the light bulb that he had allegedly used to threaten the victim. He said he had knocked the cover to the dome light off, however, while having sex with the victim. He remembered telling her he "wanted" her, to which she responded, "What about what I want?"

The assistant State's Attorney who took defendant's statement testified that he incorporated defendant's actual words into the transcription. Defendant told him that the statement was accurate but that he would not sign it.

Amie Carroll, defendant's mother, was the sole witness for the defense. She saw her son between 9:30 and 10 p.m. on October 20, 1986, and noticed someone in his car, although she could not tell whether the person was male or female. Her son borrowed $5 from her, and she did not see him again because she went to work.

At the conclusion of the proceedings, defendant was found not guilty of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)) but guilty of criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1)).

During the sentencing hearing, the State produced two witnesses, young females, who testified that they had been sexually attacked by defendant. The first witness was 15 years old when defendant enticed her into his car and then drove to a dark, abandoned street behind a

building. She was able to struggle and get away when a security guard called the police, who then arrested defendant. The other girl, 12 years old, baby-sat for defendant's child. She was alone in the apartment with him and asked him to drive her to her grandmother's house. Instead, defendant tried to grab her breast and would not let her leave until she threatened to tell defendant's girlfriend and the police.

In mitigation, six witnesses testified as to defendant's nonviolent nature.

The court imposed a prison term of six years.

OPINION

I

Defendant first argues that he was denied a fair trial because the court allowed Deborah to testify concerning her sister's statements. He maintains that prior, consistent statements offered to corroborate a victim's testimony generally are inadmissible, citing *People v. Buckley* (1976), 43 Ill. App. 3d 53, 356 N.E.2d 1113.

■ In the pending case, however, defense counsel failed to properly preserve this issue for appeal. The record reveals a single defense objection made during Deborah's testimony, which did not specify any reason for the objection and which never was renewed. At the time, most of her testimony was in evidence. Furthermore, counsel failed to mention Deborah's testimony in either of two motions for a new trial. Illinois law requires defendants to object at the time the evidence is offered and to renew the alleged error in the post-trial motion, or it is considered waived. *E.g., People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

Defendant nevertheless characterizes the admission of Deborah's testimony as "plain error." Nothing in his brief supports that label, however. The law does caution against admitting statements that do not fit the "spontaneous declaration" exception to the hearsay rule (see *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865); however, complaints that corroborate the victim's testimony may be considered merely cumulative and therefore harmless error. See *People v. Jackson* (1971), 3 Ill. App. 3d 303, 279 N.E.2d 8.

■ We also reject defendant's assertion that his trial attorney's failure to object to Deborah's testimony amounts to ineffective assistance of counsel. He does not support this conclusion with reasons or citations, and we note that the trial court expressly commented on the professional conduct and efforts expended by counsel in this case. Ineffective assistance of counsel was raised in a second, untimely motion for new

hearing that was filed without leave of court. The court reviewed the pertinent law and held, "[T]he *** standards [of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052], substantiating ineffective assistance of counsel, are most certainly not met by my review of the notes, my trial notes. Moreover, the motion filed today, if anything, supports the Court's [prior] evaluation that defense counsel was diligent and effective throughout the trial. Moreover, none of the allegations in this motion substantiate or provide a basis for overruling the jury verdict heretofore rendered in this cause."

We conclude that counsel's failure to object to the testimony of the victim's sister is not the type of serious error that deprives a defendant of his constitutional rights under the sixth and fourteenth amendments.

## II

Next, defendant contends that the admission of an unsigned document (purporting to be his statement) constitutes plain error. He concedes that admissions made by a defendant are generally admissible (*People v. Burns* (1981), 99 Ill. App. 3d 42, 424 N.E.2d 1298), but contends that since the written statement was unsigned it had no probative value and served only to prejudice the jury. Defendant further argues that since two of the State's witnesses already had testified about his oral statements, admission of the document into evidence unfairly emphasized their testimony.

Defendant cites no authority for his position that the lack of his signature rendered the written statement inadmissible. Nor does the State cite authority on this issue. Instead, the State contends that since a party's admissions are substantive evidence of guilt, and the written statement in the pending case incorporated defendant's own words, it properly corroborated the oral testimony of the officer and State's Attorney who testified regarding their conversations with defendant.

We note that defendant does not argue that the statement attributed to him was coerced or inaccurate. Defendant had agreed to sign it at one time, but ultimately declined to do so. There is no evidence that he repudiated his statements to the officials.

■ Our research reveals that the absence of a defendant's signature on a writing that is offered as his statement or confession will not render it unreliable (and thus inadmissible), as long as a proper foundation has been laid. (See *People v. Chattic* (1974), 21 Ill. App. 3d 986, 316 N.E.2d 160; *People v. McNeil* (1968), 99 Ill. App. 2d 273, 240 N.E.2d 721, citing *People v. Perkins* (1959), 17 Ill. 2d 493, 162 N.E.2d 385.) In general, if there is testimony that the transcript reproduces the actual questions asked and the answers given, the authenticity element is satis-

fied. (See *People v. Wilson* (1981), 92 Ill. App. 3d 370, 415 N.E.2d 1315.) In the pending case, however, the State's Attorney who prepared the statement from his notes admitted that he paraphrased what defendant said and put it into sentence form. He also stated that he used as many of the defendant's actual words and phrases as possible. Whether this format adequately meets the foundation requirement is uncertain, although at least one court has commented that it could find "no case which authorizes the admission of an unsigned statement which is a paraphrase." *People v. Davis* (1988), 166 Ill. App. 3d 1016, 1019, 520. N.E.2d 1220, 1222, *appeal denied* (1988), 121 Ill. 2d 575, 526 N.E.2d 834.

■ We believe that the unsigned document prepared by the State's Attorney should have been excluded for another reason, however. Assuming that the statement was not invalid for want of signature, we nevertheless believe that the document itself should not have gone back to the jury room as a physical exhibit. In *Chattic, McNeil*, and *Wilson*, where unsigned statements or confessions were introduced in evidence, the juries were not given the actual written statements to peruse during deliberations. Instead, the statements were *read* to the juries.

In our opinion, the transcription of defendant's statement should not have been given to the jury to pore over during deliberations, even if the statement itself contains admissions that corroborate the other oral testimony. Our caution stems from concern over the undue weight that jurors may accord the written word, especially when they must rely on their memories alone when considering the oral testimony.

Moreover, we question the probative value of an unsigned, incriminating statement, even when an attempt is made to establish a proper foundation for its reliability. A defendant may fail or refuse to sign such a document for a number of reasons, but surely one of them is that he does not agree that it accurately reflects what he has said. This danger is greatly reduced when his signature appears on the statement. In the pending case, however, the testimony indicates that defendant confirmed the accuracy of his statement.

■ Even though we hold that the unsigned, written statement should not have been given to the jury, we do not find that reversible error occurred. The evidence against defendant is overwhelming. Defendant's admissions were already in evidence through the oral testimony of the two State's witnesses. Defendant told the police and State's Attorney details that tracked the victim's testimony in many respects. For example, defendant admitted that he took Rosalind into a dark, secluded street and made advances which she resisted; she screamed, struggled, and tried to leave the car. He admitted tackling her and tak-

ing her back into the car. He told Foster that she had not wanted to have sex with him and that the incident had been "scary," an odd choice of words if Rosalind were a willing partner. Under these circumstances it is difficult to see how the jury could have found that the victim was a willing partner in defendant's sexual activities.

In fact, defendant did not put on a formal defense, leaving the State to prove all elements of the offenses charged beyond a reasonable doubt. Defendant has not raised reasonable doubt as a grounds for reversal and we conclude that the submission to the jury of defendant's unsigned statement was harmless error.

### III

Defendant also challenges the trial court's ruling concerning the possible admission of defendant's prior, misdemeanor offenses to impeach him if he chose to testify at trial. The record reveals that two young girls testified at the sentencing hearing as to defendant's alleged attempts to force himself on them sexually. The jury did not hear this evidence at trial, however, because the trial court granted defendant's motion *in limine* barring its use during the State's case in chief. Defendant's challenge on appeal is based on the trial court's failure to further exclude this evidence for impeachment purposes.

Defendant argues that impeachment through evidence of other crimes can only be allowed if the evidence fits the requirements of *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. Under that decision, the trial court may permit evidence of a defendant's prior *convictions*, under certain circumstances. Generally, if the conviction is for a felony or for any offense which involves "dishonesty or false statements," the court may permit the State to impeach defendant's credibility therewith, as long as the trial court determines that its probative value outweighs its prejudicial impact. *Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695; see also *People v. Spates* (1979), 77 Ill. 2d 193, 395 N.E.2d 563 (any misdemeanor based on lying, deceiving, cheating, or stealing may be used for impeachment).

Defendant maintains that there is no authority for using misdemeanor *charges*, as distinct from convictions, to impeach his credibility. He states that his right to testify in his own behalf accordingly was chilled when the court ruled that this evidence could be used if he decided to testify.

■ The issue posed, however interesting, is not one that this court must decide. The record does not support defendant's assertion that the trial court actually ruled that it *would* allow the State to use this evidence for impeachment. On the contrary, the trial court expressly *re-*

*served* its ruling as to whether the State could use such evidence in rebuttal or during cross-examination if defendant testified in his own behalf.

Defendant did not testify, however, which makes this issue academic. If defendant took the witness stand and asserted that Rosalind *agreed* to sexual intercourse, presumably the State would have sought to use the prior, sex-related incidences to impeach his credibility, since each alleged offense involved a young girl and an element of coercion rather than consent. If the court had then determined that the probative nature of the evidence outweighed its prejudicial impact, and allowed the jury to hear it, the issue would have become ripe for our review. Instead, the court merely reserved ruling until such time as the issue was squarely presented at trial. Since defendant did not testify and the evidence was not published to the jury, we decline to address the merits of the argument.

We are not insensitive to the notion that the trial court's ruling on this issue may have influenced trial strategy, however. Certainly, if the court had barred the evidence outright, defendant could have then put on a consent defense, without fearing that the jury would hear of the other sex offenses. Defendant already had won exclusion of this evidence from the State's case in chief. The trial court was understandably reluctant to rule in advance that such evidence never could be used for impeachment or rebuttal purposes. Therefore, the court declined to issue an advisory opinion regarding the admissibility of the evidence.

We believe that the trial court's decision to reserve its ruling was entirely appropriate. Defendant's decision to testify or not testify was not one for the court to decide. While the defense strategy may have been somewhat or even greatly influenced by the risk that the evidence would come in, the court was not required to remove that risk in advance. Accordingly, we conclude that defendant is not entitled to a new trial based on this issue.

For the foregoing reasons, we uphold the trial court's rulings and affirm defendant's conviction and sentence.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.