THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDDIE DURR, Defendant-Appellant.

First District (5th Division)   No. 77-306

Opinion filed March 17, 1978.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant was charged by indictment with the murder of Robert William Lange and the armed robbery of William Mitchell (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3), 18—2). Prior to trial, defendant filed a motion to suppress a confession allegedly coerced by the police. Following a hearing, the trial judge denied defendant's motion. Trial was held before a jury, and defendant was found guilty of both charges. The trial judge sentenced defendant to 25-75 years for murder and 4-12 years for armed robbery, the sentences to run concurrently. On appeal, defendant contends (1) the trial judge erred in excluding the testimony of a defense witness, (2) the trial judge did not afford him the opportunity to elect sentencing under the law in effect at the time of the crimes.

We affirm defendant's conviction and remand this cause for resentencing.

### Motion to Suppress Hearing

At the hearing on the motion to suppress, Chicago police officer Daniel McCarthy testified that defendant served as a police informant from

March 11, 1975, until March 19, 1975, the date of his arrest for the instant offense. On March 17, 1975, McCarthy first learned of defendant's involvement in a murder on April 15, 1972, after conversing with defendant's brother-in-law, Edward Yancy.

In the late evening of March 19, 1975, McCarthy and his partners, Officers Schuttler and Kulekowskis, went to the 50th on the Lake Motel for a prearranged meeting with defendant. Thereafter, defendant was taken to the 21st District Tactical Unit, led to a room on the second floor, and informed that he was under arrest for the investigation of a homicide. McCarthy advised defendant of his rights and afterwards defendant said "Do you think I did it?" A short time later, defendant repeated his question and McCarthy told him they had a statement implicating him as one of the participants in a homicide. Defendant then stated "I can beat this in court so I'll tell you what went down." McCarthy again read defendant his constitutional rights and defendant related that he wished to talk about the homicide.

McCarthy testified that defendant made several requests of him during their conversation. Defendant asked that he not be placed in the same jail cell as his brother-in-law, that he not be sent to Stateville Penitentiary, that he be given permission to leave the State once he was eligible for parole, and that he not be put in a prison cell near an uncle who was a guard at the County Jail. McCarthy explained to defendant that he would relate these requests to the appropriate authorities.

McCarthy stated that he never promised defendant a light sentence if he confessed nor threatened him with a heavy sentence if he did not make a statement. McCarthy also never told defendant that defendant's sister had signed a written statement implicating him. After McCarthy's conversation with defendant, he was transported to Area I Homicide and placed under arrest.

During cross-examination, McCarthy explained more fully the circumstances surrounding the meeting he and his partners had with defendant at the motel. McCarthy had obtained the motel room for defendant after the latter told police that he had information pertaining to a narcotics deal. Defendant had requested $500 in cash, a woman and an unmarked car. The police agreed to meet him at the motel on the evening of the 19th ostensibly to finalize the arrangements.

McCarthy testified that defendant was placed under arrest only after they were at the police station. He was neither handcuffed nor searched. The police did not threaten defendant physically or verbally nor inform him of the facts and circumstances of the murder. McCarthy further stated that he informed the assistant State's Attorney of defendant's requests and his responses to those requests.

Officer James Kulekowskis substantially corroborated McCarthy's

testimony and also stated that he observed no marks on defendant's forehead at the time of defendant's arrest. Officer John Schuttler corroborated McCarthy and Kulekowskis' testimony regarding defendant's remark that he could "beat this in court," and the substance of defendant's requests. Schuttler heard no threats nor promises made to defendant and noticed no bruises on his forehead.

William Maki, an assistant State's Attorney, testified that he was assigned to the Felony Review Unit on March 20, 1975. Initially he spoke to defendant alone. Maki read defendant his rights and in the presence of a court reporter and Homicide Investigator Joseph Deloughery, Maki took a statement from him. Maki did not notice anything unusual about his appearance. After being shown a photograph of defendant reflecting a dark mark on his forehead, Maki agreed that the dark mark was present on the night he took defendant's statement.

Investigator Deloughery testified that he was present at defendant's initial interview with Officers McCarthy, Kulekowskis and Schuttler. Deloughery advised defendant of his rights and asked him why he wished to confess to a murder that was three years old. Defendant responded that his conscience had been bothering him. Deloughery stated that he was also present during the taking of the statement by the assistant State's Attorney and did not recall anything unusual about defendant's appearance.

During cross-examination, Deloughery was shown a photograph of defendant bearing a dark mark on his forehead. After seeing the photograph, Deloughery acknowledged that there could have been a mark on defendant's forehead that evening. Deloughery stated that no one in his presence ever struck defendant and explained that he took a second statement because defendant had insinuated that promises had been made to him by police.

Defendant testified in his own behalf. He stated that at approximately 10:30 p.m. on March 18, 1975, he was in a room at the 50th on the Lake Motel when he noticed lights shining in his window from the direction of the parking lot. He looked outside and noticed an unmarked police car. He then heard a knock on the door and assumed it was the police so he opened it. He recognized Officers McCarthy and Kulekowskis who came in and asked him about the murder. They subsequently produced a statement they had taken from Yancy implicating defendant in the murder. One of the officers also told defendant that they had another statement to the same effect from defendant's sister. Neither officer apprised defendant of his constitutional rights. Kulekowskis searched defendant and both officers searched his room. During the course of the questioning, McCarthy sat by the door of the motel room, holding a pair

of handcuffs in one hand and repeatedly hitting the handcuffs against the palm of his other hand. Defendant perceived this as a threatening gesture.

Defendant then heard another knock on the door and another officer, armed with a gun, entered and said it was time to leave. The officers handcuffed defendant and took him to the police station. At the station, one of the officers pointed to several pictures of black men hanging on the wall and stated to the effect that these were dead men. The police further told defendant that a man was murdered on Blackstone Avenue, that another person was robbed and that a woman had witnessed the crime. The police refused defendant permission to make a phone call.

The following morning, defendant told Investigator Deloughery that he had nothing to say about the murder. Officer Schuttler told defendant that he would receive a lighter sentence if he told him who else was involved in the murder. Defendant denied knowledge of the crime. Defendant further testified that during the course of the questioning at the police station, he was granted permission to use the washroom and Kulekowskis accompanied him. While defendant was in the washroom, McCarthy came in and hit him on the side of the neck, causing him to bump his head on the tile wall. After this incident and additional threats from McCarthy, defendant decided to give a statement. In answering the assistant State's Attorney's questions, defendant repeatedly used the word "right," a word he did not often use, to indicate that the statement he was giving was not genuine.

During cross-examination, defendant related that he had been staying at the motel for approximately six hours before the police arrived. A woman had taken him to the room and after they spent two hours together, she gave him the key and arranged to meet him later. Defendant stated he did not know any of the officers and for a full day, refused to give a statement. It was only after McCarthy pushed him and pointed to the picture of the dead men on the wall, that he agreed to give a statement. He never told the assistant State's Attorney that he had been threatened nor did he seek medical treatment.

On redirect, defendant stated that after he hit his head, Kulekowskis gave him some paper towels and told him to wipe his face. Defendant further stated that the first time he received *Miranda* warnings was from the assistant State's Attorney.

At the conclusion of the hearing, the trial judge denied defendant's motion to suppress the statement.

## The Trial

*The State's Case*

Carole Lange testified that in the late evening of April 15, 1972, she and

her husband, Robert William Lange, attended a party at 5022 S. Blackstone Avenue. At approximately 11:30 p.m. she noticed her husband was absent and she was told that he went out with William Mitchell to purchase beer. At 12:10 a.m. she heard what she thought were three gun shots. A few moments later, William Mitchell ran into the room and said that her husband had been shot. Mrs. Lange immediately ran outside and observed her husband lying down in the street. He was taken to the hospital and died a short time later in the emergency room.

William Mitchell testified that he and the deceased left the gathering at approximately 11:30 p.m. and went to East 53rd Street to purchase beer. After purchasing the beer, they walked west on 53rd Street, turned north on Blackstone, and proceeded down the east side of the street. A young man ran up from behind and stopped short in front of the two of them. He had his hand in his coat pocket and told Mitchell and Lange to give him their money. Two other men arrived from the same direction as the first. All three men were black and in their early twenties. One of the men had a gun and stood off to the left. The man with his hand in his pocket positioned himself in front of Lange and the other man stationed himself in front of Mitchell. Mitchell gave the man in front of him his wallet containing $50, identification and credit cards.

Lange and the man in front of him began fighting and subsequently, the man in front of Mitchell joined the scuffle. The man with the gun did not move and Mitchell remained standing with his hands in the air. The scuffle was moving north and towards the west side of the street. The man with the gun started following the scuffle, aiming the gun at Lange and pulling the trigger. Mitchell heard the gun click above five times and then fire two or three times. The three men fled north and Mitchell ran over to Lange who requested help. Mitchell ran to the party and told the people there that Lange was hurt and to call the police. Everyone went downstairs and the police arrived in a few minutes.

During cross-examination, Mitchell testified that he did not actually see the shots being fired and that he was unable to identify anyone during the course of two lineups. Mitchell also stated that he had testified in 1972 in a proceeding charging another individual with the instant offense.,

Ruth Tribby testified that on April 15, 1972, she lived at 5200 S. Blackstone. At approximately 12:10 a.m. she went outside with her dogs and headed south on the west side of the street. She first noticed a white man with his hands in the air and three or four black men with him on the east side of the street. Tribby heard swearing and saw a fight beginning. She ran back to her apartment yelling for help. A few minutes later, she returned outside and observed police officers and several persons. A brown paper bag containing beer, a jacket and a hat were laying on the

ground. During cross-examination, Tribby stated that she saw a lineup that same day but did not recognize anyone.

Officer McCarthy, Investigator Deloughery and Assistant State's Attorney Maki were each called by the State. Their testimony was substantially similar to their testimony at the hearing on the motion to suppress. The following further facts were elicited:

McCarthy stated that defendant orally confessed to him that defendant, his brother and a man defendant did not know were on 53rd Street and decided to rob someone. They previously had procured a gun. They observed two white males walking north on Blackstone. Defendant produced a weapon and asked the taller of the two men for money. The shorter man became involved in a fight with defendant's brother and the third man. The fight proceeded north and across the street. Defendant pointed the gun at the shorter man, clicked it five times and it fired. Defendant stated that he then ran north on Blackstone to 52nd Street and westbound on 52nd Street through various gangways and alleys. Deloughery stated that defendant told him that his brother left his coat at the scene and that defendant beat the gun he used with a hammer and buried it in a vacant lot.

Maki read aloud the written statement he took from defendant. The content was substantially the same as the oral statement attested to by McCarthy. In addition, defendant stated that he noticed a woman walking a dog on the night of the occurrence. Defendant also related that there was $40-$50 and identification in the wallet and that he burned the wallet. Defendant also stated that it was the first time he had fired a gun and that it was an accident.

### Defendant's Case

Defendant testified in his own behalf. In substance, his testimony was similar to his testimony at the hearing on the motion to suppress. Additionally, defendant stated that besides hitting him in the bathroom, McCarthy pushed him in the motel room. Defendant explained that he was fearful of reporting the incident to the assistant State's Attorney because he assumed the attorney was conspiring with the police. The police told defendant everything to say during his statement including that he did not mean to shoot the deceased.

Defense counsel then attempted to put Leonard Barbour on the witness stand. Barbour was a prior suspect who defendant claimed was coerced by police to confess to the instant offense and was supplied with sufficient information with which to do so.

Out of the presence of the jury, Barbour testified that police officers whose names he did not recall arrested him in September of 1972 while he

was a patient in a hospital in Rockford. At the police station, Officers Banahan, Donnelly and Fitzgerald told him to say that an individual named Chris Walton shot Lange twice and that George Walton and Carl Evans were also involved. The police also furnished him with the details of the armed robbery and murder. Although Barbour was actually in North Dakota at the time of the shooting, he agreed to confess in exchange for a promise of leniency on a pending criminal charge. Barbour was also in need of medical treatment, and was only allowed to return to the hospital after he gave a statement. Barbour deliberately misspelled his signature on the statement to indicate that his confession was coerced.

The trial judge ruled that the above testimony was irrelevant and thus inadmissible because different police officers were involved and three years had elapsed between Barbour's and defendant's arrest. Before the defense rested, the State agreed to stipulate that a charge against the Walton brothers was dismissed at the request of the State's Attorney.

## State's Case in Rebuttal

John Palmer, the manager of the 50th on the Lake Motel, testified that he gave McCarthy a complimentary room from March 17-19, 1975. Maki was recalled and shown a photo of defendant taken 10 days before his arrest for the instant offense, which revealed the same mark on defendant's forehead. Kulekowskis testified that when he took defendant to the washroom, no force was used on him.

After closing arguments, the jury found defendant guilty of murder and armed robbery. The judge sentenced defendant to a term of imprisonment of 25-75 years for murder and 4-12 years for armed robbery, the sentences to run concurrently.

OPINION

Defendant contends that he was denied the opportunity to fully present his defense due to the trial judge's ruling that the testimony of Leonard Barbour was inadmissible. We disagree.

■■ As defendant points out "[a] defendant is entitled to all reasonable opportunities to present evidence which might tend to create a doubt as to his guilt." (*People v. Bergeron* (1973), 10 Ill. App. 3d 762, 769, 295 N.E.2d 228, 232.) However this caveat is circumscribed by the requirement that in order to be admissible, the evidence offered must be relevant. "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." *Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769. See also *People v. Monroe* (1977), 66 Ill. 2d 317, 321, 362 N.E.2d 295, 297.

Defendant maintains that the testimony of Barbour was relevant because it rendered the issue of police coercion more probable in the instant case. We note, however, that the alleged coercion of Barbour occurred three years before defendant was arrested. Barbour was also arrested while he was in need of medical treatment. Furthermore, Barbour was questioned by different police officers than those involved in the instant case. Given the lapse of time and the dissimilarity between the parties and circumstances involved, we find no significant connection between the alleged coercion of Barbour and the alleged coercion of defendant.

Defendant contends that *People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d 645, 222 N.E.2d 801, is authority for a finding that the exclusion of testimony which was central to his defense, was improper. In *Watson*, defendant was convicted of attempt to commit forgery. Our supreme court held that it was error for the trial judge to exclude evidence of similarly forged checks which were cashed after the defendant was incarcerated.

In *Watson*, unlike here, the disputed evidence bore directly on the actual guilt or innocence of defendant and could have operated as a complete defense. Neither the circumstances surrounding Barbour's confession nor the fact that Barbour was arrested bears on the guilt or innocence of defendant for the instant offense. See *People v. Tillman* (1969), 116 Ill. App. 2d 24, 253 N.E.2d 873.

Defendant further urges that Barbour's testimony casts doubt upon the credibility of defendant's confession. The State argued in closing that only a person who was present at the time the offense was committed could have supplied the details contained in defendant's confession. Defendant contends that if the jury could have heard the impeaching testimony of Barbour, they would have realized that the police could have furnished the details of the offense to defendant. See *People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d 645.

However, there was no direct proof that Barbour was actually coerced into making a confession or was supplied with the details of the crime by police. The tendered evidence could have only caused the jury to speculate and was thus irrelevant. (See *People v. Cole* (1975), 29 Ill. App. 3d 369, 329 N.E.2d 880.) Through defendant's testimony, the jury was given ample opportunity to consider whether the police had furnished defendant with the details of the crime.

■■ Although we hold that the proffered testimony of Barbour was properly excluded, we find that the trial judge erred in failing to afford defendant the opportunity to elect sentencing under the law in effect at the time of the crime rather than the law in effect at the time of the trial.

The statute in effect at the time of the offense provided that armed robbery was punishable by a minimum term of imprisonment of 5 years, with no mandatory parole term. (Ill. Rev. Stat. 1975, ch. 38, par. 18—2(b).) The Unified Code of Corrections, in effect at the time of trial, provided for a minimum term of 4 years, and a mandatory parole term of 5 years. (Ill. Rev. Stat. 1975, ch. 38, pars. 18—2(b), 1005—8—1(b), 1005—8—1(c)(2), 1005—8(1)(e)(1).) Defendant was sentenced under the latter statute and received 4-12 years for his armed robbery conviction.

In *People v. Bedford* (1977), 53 Ill. App. 3d 1005, 1010-11, 369 N.E.2d 84, 88, the identical issue was presented to our court. The court stated:

"The question here is not, as the State claims, whether the later statute is more beneficial to defendant than was the earlier statute (see *People v. Zboralski* (1975), 33 Ill. App. 3d 912, 338 N.E.2d 925), but whether defendant was permitted to exercise his right to elect between sentencing under either of those statutes. (*People v. Hollins* (1972), 51 Ill. 2d 68, 280 N.E.2d 710; *People v. James* (1970), 46 Ill. 2d 71, 263 N.E.2d 5; see also *People v. Gonzalez* (1974), 56 Ill. 2d 453, 308 N.E.2d 587.) Defendant here states he should have been free to choose between the two types of sentences and that he was denied the right to make that personal choice. Because of the two different statutory provisions for sentencing, and the record's failure to demonstrate that he was given the opportunity to make that choice, the matter must be remanded for resentencing. *Hollins*, at 71; *James*, at 73; *People v. Brown* (1977), 47 Ill. App. 3d 920, 365 N.E.2d 514.

We are aware that defendant already has been sentenced to a minimum statutory term of 4 years, while if he elects to be sentenced under the law applicable at the time of the offense instead, the lowest term to which he could be sentenced is 5 years. A resentencing in accordance with the latter statute would work no constitutional disadvantage to defendant, however, since he had a right to intelligently and voluntarily choose between that sentence, which lacks a parole provision, and the alternative statute which carries with it a lower minimum term but also a mandatory parole period. See *Blackledge v. Perry* (1974), 417 U.S. 21, 40 L. Ed. 2d 628, 94 S. Ct. 2098; *North Carolina v. Pearce* (1969), 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072; *People v. Baze* (1969), 43 Ill. 2d 298, 253 N.E.2d 392."

The reasoning of *Bedford* is equally applicable to defendant's sentence for murder, regardless of which statute is seemingly more beneficial to defendant. (See Ill. Rev. Stat. 1971, ch. 38, pars. 9—1(b), 1—7(1), Ill. Rev. Stat. 1975, ch. 38, par. 9—1(b), 1005—5—3, 1005—8—1.) We note,

however, that when defendant does elect, he must do so consistently. That is defendant must opt for the prior statute as to both charges or the prior statute for neither charge. See *People v. Johnson* (1976), 43 Ill. App. 3d 91, 356 N.E.2d 1134, *People v. Collins* (1976), 37 Ill. App. 3d 202, 345 N.E.2d 730, *People v. Emmett* (1975), 34 Ill. App. 3d 167, 340 N.E.2d 235.

For the foregoing reasons, defendant's convictions for murder and armed robbery are affirmed. The sentences are vacated, and the cause remanded to allow defendant to elect between sentencing under the law in effect at the time of the offenses and the law in effect at the time of trial, and for the appropriate sentences to be imposed.

Affirmed in part, vacated in part and remanded with directions.

SULLIVAN, P. J., and MEJDA, J., concur.