THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN MURRAY, Impleaded, Defendant-Appellant.

First District (6th Division)   No. 1—90—3207

Opinion filed September 17, 1993.

RAKOWSKI, J., concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Lynne Hubanks Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Sara London, Special Assistant State's Attorney, and Renee Goldfarb, Randall E. Roberts, and

James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Following a jury trial in the circuit court, defendant was convicted of first degree murder pursuant to section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) and sentenced to life imprisonment. The issues on appeal are: (1) whether defendant was proven guilty of first degree murder beyond a reasonable doubt; (2) whether the trial court's denial of defendant's motion to suppress statements and quash his arrest was reversible error; (3) whether comments by the trial judge during pretrial motions were improper and prejudicial to defendant; (4) whether the trial court abused its discretion in allowing the admission of photographs and body charts of the deceased and in allowing selected photographs and charts to go back to the jury room; (5) whether the trial court erred in granting the State's motion to exclude testimony of prison inmates regarding police misconduct; (6) whether the trial court erred in limiting defense counsel's direct examination of defense witnesses and the cross-examination of the State's witnesses; (7) whether the admission of rebuttal testimony of a gang crimes expert was improper; (8) whether the trial court erred in not answering questions presented by the jury; and (9) whether defendant was denied effective assistance of trial counsel by counsel's failure to order the bond hearing transcripts of defendant's first two court appearances. We affirm.

On February 28, 1989, a hearing commenced on defendant's motions to suppress statements and evidence and quash his arrest. At the hearing, Chicago police officer Joseph Anthony Mescall testified that he made a traffic stop at around 7:30 p.m. on January 18, 1988, at 3558 West Franklin Boulevard in Chicago. The driver of the vehicle was Tyrone Washington, who was a codefendant but waived a jury trial and pled guilty. Washington was placed under arrest because he could not produce a driver's license. There was also an outstanding warrant for his arrest for aggravated assault and a stop order for a double murder.

Detectives Kriston Kato and John Summerville testified that at around 9:30 that night they questioned Washington regarding the murders of Brian Fowler and DeJuan Buck which had occurred on November 13, 1987, near 3330 West Fulton. Washington named several individuals connected with the murders and where they could be found. The detectives then went to a "dope house" at 3233 West Fulton to find someone known as Lamont. They were informed that La-

mont was defendant Kevin Murray and that he lived with his mother at 2724 West Gladys. The detectives then went to this location but were informed that defendant was not there. They left instructions with defendant's mother to have defendant call them when he came home. When the detectives returned to the police station they received a call from defendant. Detective Kato spoke with defendant and told him that he wanted to speak with him about the murders of Fowler and Buck. Defendant agreed to talk with them but said that he needed a ride to the police station.

Kato and Summerville went to defendant's home and brought him back to the police station. According to Kato's testimony, defendant was not handcuffed and was not advised of his *Miranda* rights until he was questioned at the police station. Defendant stated that he understood his rights and then stated that at around 4 a.m. on November 13, 1987, he was at the "dope house" at 3233 West Fulton when Washington and someone known as Jet arrived with a gym bag containing two machine guns. Defendant told the detectives that Washington and Jet said they had done a "mission." Defendant was not handcuffed nor was the interview room locked during this session, which lasted approximately 30 minutes.

At around 7 a.m. Kato and Summerville had a second conversation with Washington during which Washington informed them that defendant was designated as the getaway driver by the leader of the Black Souls street gang, Sam McKay. Washington also implicated himself and said that he had witnessed the shooting. After the second conversation with Washington, the detectives locked the door to the interview room where defendant was located and went out to look for other people whom Washington had identified.

The detectives were unable to find any of the other people implicated by Washington, and they returned to the police station at 5 p.m. At that time defendant agreed to take a polygraph examination, and he signed a form which again advised him of his rights and indicated that he was voluntarily taking the test. After the polygraph examination, defendant was brought back to the police station at 9:45 p.m. Shortly thereafter, the detectives again spoke with defendant, advised him of his rights, and informed him that the polygraph test showed that he was not being truthful. According to Kato's testimony, defendant then presented a different version of the murder of Fowler and Buck. The detectives left the police station to look for weapons used in the crime and did not return until 6 a.m. on January 20, 1988.

At 7:15 that morning, Assistant State's Attorney Lavin spoke with defendant about providing a court-reported statement regarding

the homicides. Lavin testified that while he was waiting for the court reporter, he asked defendant if he had been treated fairly, fed, and allowed to use the bathroom. According to Lavin, defendant stated that he had been treated fairly and that he had been fed and had gotten some rest. Lavin further testified that defendant never complained about any mistreatment, and he observed no marks or bruises on defendant. When the court reporter arrived, defendant's statement was taken in the presence of Summerville and Lavin. Defendant then read the statement, initialled each page and signed the statement. The statement was also signed by Lavin and Summerville. According to the testimony of Lavin, Kato, and Summerville, defendant was not told that he would not be charged with the murders if he gave a statement. Summerville and Kato also testified that defendant was not hit in the head or back, and he was given an opportunity to eat, rest and use the washroom. In addition, no one made any threats or promises to defendant while he was in police custody.

Defendant presented the testimony of his aunt, Vanetta Brown. She stated that she was with defendant when the police came to take him to the police station and that they placed handcuffs on him at that time. She also accompanied defendant and the officers to the station and waited for him until around 2 a.m., when it was suggested that she go home. On cross-examination, Brown acknowledged that defendant knew the officers wanted to question him and that he agreed to talk with them.

Defendant testified at the hearing that he agreed to go to the police station to talk with the detectives but that he was placed in handcuffs as soon as the police arrived at his house. He also stated that he was questioned about the murders but was slapped and punched in the stomach when he denied any knowledge of them. The second time he was questioned defendant was kicked in the stomach, chest, and leg and hit in the head and neck. Defendant then told the officers that his girl friend Serena would tell them where he was the night of the murders, but Kato said that Serena had told them the truth and that he then punched him in the ribs and hit him on the side of his head. Defendant was then taken to the room where Washington was retained. Washington was then questioned in defendant's presence, and when he claimed that Washington was lying, defendant was again slapped on the side of his head, kicked in the stomach and "chopped" in the neck. Defendant further testified that he was not allowed to call his mother or speak to his aunt. When the detectives left, defendant paced the room for a short period and then slept. He denied being given anything to eat or allowed to use the bathroom.

Defendant claimed that he was told that he had to take a lie detector test and that he could go home if he passed. When he returned to the station, Kato asked him if he was ready to talk. However, when defendant denied any knowledge of the murders Kato "backkicked" him and slapped him on the side of the head. Summerville then took him to a different room, barricaded the door with a chair and slapped him on the side of the head and kicked him between the legs. When defendant asked about a lawyer Summerville began "back punching" him. At this point, Kato told defendant that he could go home if he agreed to do what they asked and that Kato told him what to say in the statement. Defendant was informed that the court reporter and Lavin were on their way to take his statement. Defendant testified that when Lavin arrived defendant told him that he did not know anything about the murders but that Lavin left the room and Kato came in and told defendant that he had almost messed up his chance to go home.

On cross-examination, defendant testified that he was examined by a paramedic outside the presence of the detectives. He stated that he was not asked how he was feeling or whether he had chest injuries or pain but acknowledged that he did not tell the paramedic that he had been mistreated by the police. He also claimed that he did not remember telling the paramedic that he was in good health. On cross-examination, defendant further claimed that Lavin did not advise him of his rights. Defendant stated that he told Lavin about being beaten by Kato. He stated that he never read the statement he gave but signed it so that he could go home.

Lavin testified in rebuttal that defendant did not make any statement to him denying knowledge of the homicides and did not tell Lavin that the detectives had beat him. Lavin also stated that he advised defendant of his rights, and he did not promise defendant that he could go home if he gave a statement.

Chicago paramedic Edward Hamilton testified that he examined defendant on January 21, 1988, and found no evidence of marks, bruises, cuts or swelling on defendant's upper body. Defendant did not report any injuries and stated that he was in good health.

The trial court held that defendant came to the police station voluntarily and the subsequent statements of Tyrone Washington established probable cause for defendant's arrest. The court further held that defendant's allegations were contradicted by the testimony of the detectives, assistant State's Attorney and paramedic and were thus unsupported by the evidence.

On September 4, 1990, the jury trial commenced. Prior to the trial, the court granted the State's motion *in limine* to exclude the testimony of jail inmates that they were mistreated by Kato and Summerville.

Police officer Ricky Galbreth testified that on November 13, 1987, he was assigned to investigate a report of shots fired in the back of 3330 West Fulton Street. When Galbreth arrived at that location he found two black males on the ground with multiple gunshot wounds as well as numerous shell casings and bullet holes in the immediate area. Several people in the area heard gunshots but did not witness the shooting. Galbreth also identified several pictures of the crime scene which included the victim Fowler as he appeared when he was found.

Police officer Tom Bachelor was working as an evidence technician on the day of the shooting. He found 20 to 25 cartridge cases.

The medical examiner, Dr. Barry Lifschultz, testified that he performed the autopsies on the victims and found that they had died from multiple gunshot wounds. In order to aid in his testimony, he used enlargements of body charts.

In addition to his testimony at the hearing on the motion to suppress, Summerville testified at the trial that defendant told him that he was a member of the Black Souls gang, which was run by Sam McKay, and that he worked as a drug dealer for McKay. During a second conversation with Summerville, defendant further implicated himself in the murders of Fowler and Buck. According to Summerville's testimony, defendant said that he had been at a meeting with Sam McKay, Jet, Paris, and Washington the day before the homicides and Sam McKay announced that Smitty, another drug dealer, should be killed. Defendant was the driver of the getaway car, and Jet and Washington were to do the shooting. Defendant also stated that on the day of the shooting he drove around until the victims were located. When Jet and Washington got out of the car defendant turned the vehicle around and parked the car about half a block away. Defendant stated that he heard multiple gunshots, and immediately thereafter, Jet and Washington ran back to the car. Defendant then drove them to the "dope" house on Fulton.

Lavin's testimony at the trial was substantially the same as his testimony at the hearing on the motion to suppress.

Defendant's court-reported statement was then presented to the jury. In the statement defendant admitted meeting with Jet, Nose (Washington), Paris and Sam on the day before the murders. The meeting was called by Sam McKay, the leader of the Black Souls

gang, for the purpose of discussing the sale of drugs by others in McKay's territory. McKay wanted those people, mainly Smitty and his boys, killed. Defendant acknowledged in his statement that he worked for Sam McKay and that he was paid $450 a week to do what McKay asked. After the meeting defendant went to McKay's house and later joined Washington and Jet. The three of them drove around looking for Smitty in order to kill him. Defendant claimed that he did not have a gun but that Washington and Jet had Uzis. When they saw Smitty's boys selling drugs, defendant stopped the car, and Jet and Washington got out. Defendant then made a U-turn and parked the car. A short time later, he heard a lot of shooting and he drove back into the alley. Jet and Washington then ran through the gangway and jumped into the car. Defendant added he was not mistreated when he was at the police station. He was given Twinkies, pop, and bologna and allowed to use the washroom. In addition, he received no promises or threats in exchange for his statement.

In addition to his testimony at the hearing on his motion to suppress, defendant testified at the trial that when he agreed to give a statement he told Kato that he did not know anything about the murders but that he would give a statement as directed. He claimed that the detectives went over all of the facts that were to be included five or six times. Defendant also stated that the entire time he was at the police station (approximately 24 hours) he was allowed to use the washroom one time and was given a sandwich and one cup of soda. As a result of the mistreatment by the detectives, he stated that he had sore ribs, a bruised arm and a slight headache. Defendant did not know where he was on the night of the murders but denied driving the getaway car, shooting the victims or being a member of the gang.

George Zuganelis testified that he was defendant's attorney for about two weeks in January of 1988. When he met defendant at the police station defendant was in an interview room crying. He noticed that the white sweater defendant was wearing had a mark in the front. Zuganelis further testified that defendant had red and blue marks on his chest, abdominal area and arms. On cross-examination, Zuganelis admitted that he was convicted of a misdemeanor crime of failing to file income tax and was sentenced to one year's misdemeanor probation and 45 days of work release. Zuganelis did not report the marks on defendant's body to anyone.

Police officer Robert Grapenthein, a gang crimes specialist, testified in rebuttal that he monitored the activities of the gang known as the Black Souls and that he was a gang crimes officer in November 1987. He stated that defendant was a member of the gang, and he

had seen him at 3233 West Fulton, a Black Souls building, on November 30, 1987.

Kato and Lavin both testified in rebuttal and denied the allegations made by defendant regarding his mistreatment as well as his communication of this to Lavin.

In addition to his prior testimony, paramedic Hamilton testified in rebuttal that he questioned defendant regarding any injuries, medical problems or complaints and that defendant had none and reported being in good health. Hamilton also stated that he saw no bruises, cuts, sores or swelling on defendant's upper body.

Defendant presented the testimony of his aunt, Vanetta Brown, in rebuttal. She again testified that defendant was handcuffed when he left the house with the police officers and that she waited at the police station for five hours without seeing defendant.

Defendant first contends that the State failed to prove beyond a reasonable doubt that he was guilty of murder. When an appeals court reviews the sufficiency of evidence as to a defendant's guilt, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) Further, a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. A conviction will not be reversed unless the evidence is so improbable that it raises a reasonable doubt of the defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.

Defendant first argues that his statement did not provide evidence of his guilt because while it made reference to the shooting of Smitty's boys, there was no evidence that Fowler and Buck were Smitty's boys or that they were selling drugs. Furthermore, at the time of his statement, defendant was never shown a picture of the murder victims, and he did not identify them as the men seen selling drugs in Black Soul territory. Defendant also claims that there were no eyewitnesses to the shooting of Buck and Fowler, and there was no evidence that the bullets found at the crime scene were fired from an Uzi, which was the weapon defendant referred to in his statement. In further support of his argument, defendant points to the fact that although Sam McKay was located by the police, he was never arrested for Buck's and Fowler's murders.

In order for a conviction based on a confession to be upheld, it must be corroborated by independent evidence outside of the confession itself. (*People v. Escobar* (1988), 168 Ill. App. 3d 30, 42, 522 N.E.2d 191.) However, there is no requirement that the independent evidence establish the crime beyond a reasonable doubt or that the independent evidence and defendant's confession correspond in every detail. *People v. Furby* (1990), 138 Ill. 2d 434, 450-51, 563 N.E.2d 421.

In the case *sub judice*, defendant's confession was corroborated by the physical evidence of the multiple gunshots as well as the numerous shell casings found near the victims and in the victims' bodies. In his statement, defendant acknowledged hearing a lot of gunshots all at once. Several people in the neighborhood also reported hearing multiple shots. The type of cartridge cases recovered which are used with automatic weapons corroborated defendant's statement that Washington and Jet were carrying Uzis, which are automatic weapons.

Defendant's confession was also corroborated by the date and location of the murders. Defendant stated that the murder of Smitty's boys was ordered by Sam McKay at a meeting on November 12, 1987, at 3230 West Fulton. Defendant said that he went to Sam McKay's house after the meeting and later drove around with Washington and Jet until they saw Smitty's boys selling drugs in their territory. Fowler and Buck were murdered on November 13, 1987, in the rear of 3330 West Fulton.

Defendant's final argument is that even if there was evidence that the men shot by Washington and Jet were Fowler and Buck, the State failed to prove that defendant was guilty of the murders based on the theory of accountability. To convict a defendant under the theory of accountability, the State must prove beyond a reasonable doubt that he: (1) solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) did so before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. Ill. Rev. Stat. 1987, ch. 38, par. 5—2; *People v. Calvillo* (1988), 170 Ill. App. 3d 1070, 1076, 524 N.E.2d 1054.

Contrary to defendant's argument, his admission that he aided Washington and Jet in their search for the victims and that he drove them away from the crime scene once the murders were committed was sufficient evidence to establish defendant's guilt beyond a reasonable doubt on the theory of accountability.

Defendant next contends that the trial court erred in denying his motion to suppress evidence and quash his arrest. He first argues that although he voluntarily came to the police station, he was illegally arrested when he was locked in an interview room two hours later. The detectives locked defendant in the interview room after their second conversation with Washington. However, defendant claims that Washington's statements did not provide probable cause for his arrest.

A determination of whether there is probable cause for a defendant's arrest should be based on whether " 'a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense.' " (*People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147, quoting *People v. Wright* (1968), 41 Ill. 2d 170, 174, 242 N.E.2d 180.) More than mere suspicion is required to meet this standard, but there is no requirement that the evidence be sufficient to convict. *People v. Moody* (1983), 94 Ill. 2d 1, 7, 445 N.E.2d 275.

When Kato and Summerville first spoke with defendant shortly after their arrival at the police station, he was not handcuffed nor was the room he occupied locked. Although he was advised of his rights, defendant agreed to speak with the officers. He told them that around 4 a.m. on November 13, 1987, he was at the "dope house" at 3233 West Fulton when Washington and Jet arrived with a gym bag containing two machine guns and announced that they had done a "mission." After the conversation with defendant, the police had a second conversation with Washington during which they were informed that defendant was the getaway driver for the shootings. In this same conversation, Washington said that "he was a witness to the shooting, and that his involvement was limited as far as shooting at the victims." It was immediately after this conversation that the room where defendant was being held was locked.

Defendant argues that Washington's statements were insufficient to establish probable cause because they were unreliable. He first cites *People v. Johnson* (1983), 94 Ill. 2d 148, 445 N.E.2d 777, for the proposition that a tip by an informant is unreliable where only the first name of the suspect is known. In *Johnson*, the court relied on the two-prong test of *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, as well as the standard set forth in *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584, in its determination that there were insufficient facts corroborating the informant's tip that the defendant in that case committed the crime. However, in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, the Supreme Court replaced the rigid

two-prong test with the "totality-of-the-circumstances" approach. See *People v. James* (1987), 118 Ill. 2d 214, 223, 514 N.E.2d 998.

■■ Under this standard, there is sufficient corroborating evidence to establish probable cause for defendant's arrest, such as the fact that defendant was known as Lamont by people other than Washington. When the police first went to the drug house looking for suspects named by Washington, they were told that defendant was Lamont and where he could be located. Other corroborating evidence was defendant's voluntary statement that he was at the same drug house close to the time of the shootings and that he saw Washington and Jet with machine guns.

Defendant further argues that Washington's statement was unreliable because he was under suspicion for the murders and was denying culpability. A co-offender's statements to the police constitute probable cause where the statements are against the informant's penal interest or are corroborated by the police's own investigation. (*James*, 118 Ill. 2d at 223; *People v. Bell* (1989), 191 Ill. App. 3d 877, 883, 548 N.E.2d 397.) Although Washington did deny shooting the victims as defendant claims, his admission that he was at the scene of the crime and witnessed its occurrence could certainly be considered as a statement against penal interest.

For the aforementioned reasons, we conclude that there was probable cause for defendant's arrest, and the trial court's denial of defendant's motion to quash his arrest was proper.

Defendant next contends that he was denied due process because the trial court only heard evidence at the pretrial hearing for the purpose of appeasing the appellate court. Defendant's allegation is based on comments by the trial judge that he agreed with the State that the felony review assistant State's Attorney was not a material witness but that based on prior appellate court rulings, the witness should testify.

As the State argues, defendant did not object to the trial judge's comments when they were made nor did he include this issue in his pretrial motion. In order to preserve an issue for appeal, a defendant must both make a contemporaneous objection and include it in his post-trial motions. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124; *People v. Thurman* (1988), 169 Ill. App. 3d 996, 523 N.E.2d 1184.) However, plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. This criterion is met in criminal cases when "the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial or

sentencing hearing. [Citations]." *People v. Young* (1989), 128 Ill. 2d 1, 47, 538 N.E.2d 453.

■ In the case *sub judice*, the evidence was not closely balanced nor was the alleged error of such magnitude as to deny defendant a fair trial. In fact, defendant has failed to show how he was prejudiced by the trial court's comments. We therefore decline to review this issue.

■ Defendant next contends that the trial court erred in allowing the State to admit into evidence photographs depicting the crime scene and the victims as well as body charts of the victims. Defendant further contends that it was error to allow the body charts as well as certain photographs to be viewed by the jury. As with the previous issue, however, defendant has waived this claim by failing to raise the issue in his post-trial motion. We also note that defendant has also failed to include the photographs or body charts in the record. Photographs are presumed to be properly admitted where any doubts arising from an incomplete record are resolved against the appellant. *People v. Hefley* (1982), 109 Ill. App. 3d 74, 76, 440 N.E.2d 173; *People v. Wilson* (1981), 92 Ill. App. 3d 370, 386, 415 N.E.2d 1315.

Defendant next contends that the trial court erred in granting the State's motion to exclude testimony from other prisoners regarding the brutality of Detective Kato and that he was denied due process and the right to put on a defense. Prior to the trial defendant sought to elicit the testimony of two witnesses who were in jail on unrelated murder charges. Both witnesses claimed that they had been beaten by Kato until they confessed to the crime. Thereafter, the State made a motion *in limine* to prohibit the testimony of the inmates, which the trial court granted. In its ruling, the trial court distinguished *People v. Banks* (1989), 192 Ill. App. 3d 986, 549 N.E.2d 766, which defendant cited as authority for calling the prison inmates as witnesses. The court stated that Banks' claim of mistreatment was supported by the evidence while the defendant's claim in the case *sub judice* was baseless and not only unsupported by the evidence but contradicted by it. The State argues that because defendant presented no credible evidence of mistreatment, the testimony of the jail inmates would only present a collateral issue which is too remote and speculative.

In *Banks*, the defendant's allegations of mistreatment were supported by the clinical findings of the physician who examined the defendant several days after he gave his confession statement to the assistant State's Attorney. The physician testified at the suppression hearing that the defendant's injuries were consistent with the mistreatment by the police which defendant described as well as the tim-

ing of its occurrence. The only evidence presented by the State was the police officers' denials of coercion and the testimony of the assistant State's Attorney that defendant did not say anything about mistreatment by the police. Citing *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571, the *Banks* court stated that where it was evident that a defendant had been injured while in police custody, the State was required to show by clear and convincing evidence that the injuries had not been inflicted as a means of producing defendant's confession. (*Banks*, 192 Ill. App. 3d at 992.) The court then held that the admission of defendant's coerced confession was reversible error.

■ In the case *sub judice*, defendant sought to introduce the testimony of Kenneth Crawford and Gregory Lewis that while in police custody they had also been beaten and kicked by Detective Kato. In the record, defendant included a summary of what their testimony would have contained. Crawford was arrested in June 1989. The allegations in his statement were that he was taken to an interview room where Kato said that Crawford had committed the murder and then kicked him in the chest, slapped him in the face and bent his finger back. Crawford was held in the interview room overnight and made a statement the next morning based on what Kato told him to say. Lewis was arrested in September 1988 by Kato and two other officers. He was handcuffed and placed in the back seat of the squad car with Kato and one other officer. Lewis alleged that he was asked about a murder and that when he denied any knowledge of one, Kato hit him twice in the testicles with a flashlight. At the police station Lewis was kicked in the chest by Kato. He was placed in an interview room where Kato questioned him about a murder and told him he was lying and was going to tell what happened. Kato hit him on both sides of his head, kicked him in the stomach and continued to question him about a murder. Lewis then agreed to say what Kato told him to say.

Whether what is offered as evidence is admitted or excluded depends upon whether it tends to make the question of guilt more or less probable. A trial court may reject offered evidence on the grounds that it is irrelevant and has little probative value due to its remoteness, uncertainty, or prejudicial nature. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696; *Banks*, 192 Ill. App. 3d at 994.) Because we believe *Banks* is distinguishable, we conclude that the trial court was within its discretion in refusing the testimony of Lewis and Crawford.

Unlike the evidence in the present case, the evidence of defendant's injuries in *Banks* was clear. Evidence established that the *Banks* defendant sustained numerous injuries, including lacerations, bruises,

scrapes, discolorations and swelling. Moreover, the *Banks* defendant presented the testimony of an examining doctor who supported defendant's theory of police brutality. In the present case, defendant does offer some evidence of physical injury in both the form of his own testimony and the testimony of his prior lawyer, George Zuganelis. However, a paramedic who examined defendant testified that defendant had no marks or other signs of physical harm. Detective Lavin, whom defendant did not accuse of mistreating him, testified that he spoke with defendant on the morning of January 20 and that defendant indicated to him at that time that he had been treated fairly. Lavin also testified that defendant did not appear to be injured. *Cf. People v. Mays* (1992), 230 Ill. App. 3d 748, 754-55, 595 N.E.2d 1088 (refusing to apply *Banks* where defendant failed to establish physical injury).

We also note, as did the trial court, that the evidence offered by the defendant in *Banks* was specific, unusual and virtually identical to his own claims of physical abuse. In contrast, defendant's allegations of abuse are general in nature, being simply that he had been kicked, slapped and punched by Officer Kato.

■ Defendant next contends that the trial court erred in limiting the direct examination of defense witnesses and cross-examination of the State's witnesses and that he was barred from presenting evidence in his own case as well as confronting the State's witnesses. Defendant claims that he was prevented from showing bias, motive, or developing new matters. Although defendant cites the number of objections made by the State and the number of those which the trial court sustained, he fails to identify which objections were incorrectly sustained or which witnesses he was improperly restricted from questioning and how he was thereby prejudiced. A reviewing court is entitled to have the issues clearly defined with a cohesive legal argument and the citation of pertinent authority and is not a depository in which an appellant can dump the entire matter of pleadings, court action, argument, and research. (*People v. Cruz* (1990), 196 Ill. App. 3d 1047, 1052, 554 N.E.2d 598; *Williams v. Danley Lumber Co.* (1984), 129 Ill. App. 3d 325, 472 N.E.2d 586.) Because defendant has failed to properly present this issue to this court, it is waived. *Cruz*, 196 Ill. App. 3d at 1051.

Defendant next contends that he was denied a fair trial because gang crimes specialist Grapenthein was allowed to testify in rebuttal and that his testimony regarding defendant's gang affiliation was irrelevant where there was no evidence that the murders were

gang-related. Contrary to defendant's contention, the evidence at trial established that when defendant spoke with the officers at the police station, he admitted being a member of the Black Souls street gang. He also admitted in his pretrial statement that gang leader Sam McKay had ordered the shooting of Smitty's boys because they were selling drugs in the gang's territory and that defendant drove the shooters around to look for the victims. However, at the trial defendant denied his gang affiliation. In response to defendant's denial, the State presented the testimony of Grapenthein in rebuttal. Grapenthein stated that he had been a gang crimes specialist for six years and that he was assigned to the Black Souls street gang. He was qualified as an expert and testified that in November 1987 the Black Souls used the building at 3233 West Fulton for their meetings. Grapenthein then stated that defendant told him that he was a member of the Black Souls. This was also confirmed by other gang members.

Rebuttal evidence is that which is presented by the prosecution to explain, repel, contradict, or disprove evidence presented by the accused. (*People v. Rios* (1986), 145 Ill. App. 3d 571, 584, 495 N.E.2d 1103.) "The decision whether to admit rebuttal testimony is within the sound discretion of the trial court, and its determination will not be reversed absent a showing of abuse of discretion." (*Rios*, 145 Ill. App. 3d at 584.) However, rebuttal testimony is generally considered to be inadmissible where it serves merely to contradict a collateral matter, *i.e.*, one irrelevant to substantive issues. *People v. Buckner* (1984), 121 Ill. App. 3d 391, 398-99, 459 N.E.2d 1102.

■ Defendant argues that the admission of the rebuttal testimony was improper because there was no evidence that the murders of Fowler and Buck were gang-related. Evidence of gang membership is admissible if it is related to the crime charged. (See *People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840.) In the case *sub judice*, the evidence of defendant's gang membership was relevant and admissible to impeach defendant after he denied his gang affiliation, and also as evidence in support of his signed statement that he was involved in the shootings. See *People v. Ayala* (1990), 208 Ill. App. 3d 586, 592, 567 N.E.2d 450; *People v. Miller* (1981), 101 Ill. App. 3d 1029, 1035, 428 N.E.2d 1038.

Defendant next argues that the trial court erred in not answering a question submitted by the jury where it was a question of law on a substantive issue and where the court failed to give defense counsel an opportunity to suggest an appropriate response. The ju-

ry's question was: "[D]oes the State's Attorney's office have any obligation toward the protection of a defendant's rights[?]" Outside the presence of the jury but in the presence of both parties, the trial court showed both counsel the question. When neither party objected or offered any input, the jury was brought back. The trial court then explained that the question could not be answered because it would require a discussion which was not permitted at that time. When the jury returned to its deliberations, and the trial court was noting that the parties were present, defense counsel stated, "[F]ine thank you, your honor. May the record reflect that it is approximately ten to 8:00."

■ It is apparent from the record that defendant had an opportunity to respond to the jury's question and that he failed to do. Thus, his allegation to the contrary is without merit. Furthermore, a trial judge may refuse to answer a jury's question where the jury instructions sufficiently explain the law, further instructions would serve no useful purpose, or be potentially misleading, the inquiry involves a question of fact, or an answer by the court would cause the court to express an opinion which would probably direct a verdict one way or another. Finally, if the jury's question is ambiguous, and any response could require a colloquy between the court and the jury, a further explanation of the facts, or an expression of the trial court's opinion on the evidence, the court may refuse to answer the question. (*People v. Reid* (1990), 136 Ill. 2d 27, 39, 554 N.E.2d 174.) In the case *sub judice*, it appears from the content of the jury's question and the trial court's comments that the court found the jury's question ambiguous and that an answer would require a lengthy and improper discussion regarding the case. Therefore, the trial court's refusal to answer the question was not improper.

Defendant's final contention is that he was denied effective assistance of trial counsel because trial counsel failed to order transcripts of the two bond hearings and to utilize the information at the suppression hearing and at the trial.

At defendant's first bond hearing on January 21, 1993, his former trial counsel, George Zuganelis, requested an order that defendant be taken to the hospital to be examined in connection with his complaint that he had been beaten by the police. At a second hearing on February 5, 1993, Zuganelis requested a second order because defendant had not been brought to the hospital as ordered.

In order to establish a claim of ineffective assistance of counsel, a defendant must show that: (1) despite a strong presumption of counsel's professional competence, counsel's allegedly unprofessional acts or omissions were outside the range of professionally competent assistance; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Stewart* (1990), 141 Ill. 2d 107, 118, 565 N.E.2d 968, citing *Strickland v. Washington* (1984), 466 U.S. 668, 690, 694, 80 L. Ed. 2d 674, 695, 698, 104 S. Ct. 2052, 2066, 2068.

■■ Defendant first argues that had trial counsel ordered transcripts of the bond hearing, the manifest weight of the evidence would have been that defendant was physically abused while in police custody, that through his initial trial counsel he made a prompt outcry to the court, and that every effort was made by defendant's first trial counsel to have defendant's injuries documented. However, in ruling on defendant's motion, the trial court not only considered defendant's apparent failure to make a prompt outcry, but also noted the fact that defendant had signed, initialed and corrected a multipage confession. The court also considered the content of the witnesses' testimony as well as their demeanor and the fact that defendant's testimony was contradicted by the assistant State's Attorney, the detectives and two paramedics. Contrary to defendant's argument, all the bond hearing transcript would have shown is that defendant's first trial counsel reported defendant's claims of abuse to the court and obtained a court order that defendant be examined at the hospital. It would not have been evidence that defendant was physically abused as he maintains. Comparing this evidence to the other factors noted by the court, we cannot say that defendant's trial counsel's omission was outside the range of professionally competent assistance or that the inclusion of this evidence would have changed the result of the proceeding.

As to the use of the bond hearing transcripts at the trial, defense counsel argues that the information contained in the documents would have served to bolster the credibility of defendant's as well as Zuganelis' testimony and impeach the credibility of the State's witnesses. However, we find little merit in defendant's argument regarding the impact of that transcript on the trial. In view of the fact that Zuganelis testified that he saw red and blue marks defendant's chest, abdominal area and arms, the transcript did not contain any additional evidence such that there would be a reasonable probability of a different outcome. We thus conclude that defendant was not denied effective assistance of counsel.

For the reasons discussed above, defendant's conviction is affirmed.

Affirmed.

McNAMARA, P.J., concurs.

JUSTICE RAKOWSKI, concurring in part and dissenting in part:

While I agree with the majority opinion on all other issues, I would reverse and remand because I believe, for the following reasons, that the trial court erred in excluding the other prisoners' (Lewis' and Crawford's) testimony.

Prior to the trial defendant sought to elicit the testimony of two witnesses who were in jail on unrelated murder charges. Both witnesses claimed that they had been beaten by Kato until they confessed to the crime. Thereafter the State made a motion *in limine* to prohibit the testimony of the inmates which the trial court granted. In its ruling, the trial court distinguished *People v. Banks* (1989), 192 Ill. App. 3d 986, 549 N.E.2d 766, which defendant cited as authority for calling the prison inmates as witnesses. The court stated that Banks' claim of mistreatment was supported by the evidence while the defendant's claim in the case *sub judice* was baseless and not only unsupported by the evidence but contradicted by it. The State argues that because defendant presented no credible evidence of mistreatment, the testimony of the jail inmates would only present a collateral issue which is too remote and speculative.

In *People v. Banks*, the defendant's allegations of mistreatment were supported by the clinical findings of the physician who examined the defendant several days after he gave his confession statement to the assistant State's Attorney. The physician testified at the suppression hearing that the defendant's injuries were consistent with the mistreatment by the police which defendant described as well as the timing of its occurrence. The only evidence presented by the State was the police officers' denials of coercion and the testimony of the assistant State's Attorney that defendant did not say anything about mistreatment by the police. Citing *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571, the *Banks* court stated that where it was evident that a defendant had been injured while in police custody, the State was required to show by clear and convincing evidence that the injuries had not been inflicted as a means of pro-

ducing defendant's confession. (*Banks*, 192 Ill. App. 3d at 992.) The court then held that the admission of defendant's coerced confession was reversible error.

The defendant in *Banks* had also been precluded from presenting the testimony of a witness that claimed he had been subjected to very similar mistreatment by the same police officers and who also had corroborating medical evidence of his claims. (*Banks*, 192 Ill. App. 3d at 994.) The *Banks* court held that not allowing the defendant to present this testimony was error and that the 13-month time lapse between defendant's incident and that of the witness did not make it too remote to be relevant. *Banks*, 192 Ill. App. 3d at 994.

In the case *sub judice*, defendant sought to introduce the testimony of Kenneth Crawford and Gregory Lewis that while in police custody they had also been beaten and kicked by Detective Kato. In the record, defendant included a summary of what their testimony would have contained. Crawford was arrested in June 1989. The allegations in his statement were that he was taken to an interview room where Kato said that Crawford had committed the murder and then kicked him in the chest, slapped him in the face and bent his finger back. Crawford was held in the interview room overnight and made a statement the next morning based on what Kato told him to say. Lewis was arrested in September 1988 by Kato and two other officers. He was handcuffed and placed in the back seat of the squad car with Kato and one other officer. Lewis acknowledged that he was asked about a murder and that when he denied any knowledge of one, Kato hit him twice in the testicles with a flashlight. At the police station, Lewis was kicked in the chest by Kato. He was placed in an interview room where Kato questioned him about a murder and told him he was lying and was going to tell what happened. Kato hit him on both sides of his head, kicked him in the stomach and continued to question him about a murder. Lewis then agreed to say what Kato told him to say.

The time lapse was nine months between the arrest of defendant and Lewis and 17 months in the case of Crawford, which was similar to the time lapse in the *Banks* case. Furthermore, as in *Banks*, the witnesses would have testified to physical abuse very much like that which defendant alleged and which was inflicted by the same police officer. Defendant also claimed that Kato slapped and punched him in the stomach, kicked him in the chest and stomach and hit him in the head.

It is true, as the majority opinion points out, that the defendant in *Banks* had corroborating medical evidence that he had been physically injured while in police custody as did the witness who alleged abuse by the same officer. However, while defendant in the case *sub judice* did not have medical evidence of the alleged abuse, defendant's attorney requested a court order that defendant be examined at the hospital on January 21, 1988, which was one to two days after the alleged beatings. Although the court entered an order, defendant still had not been taken to the hospital on February 5, 1988. The trial court then granted a second order, but by that time 17 days had elapsed since the alleged mistreatment. In addition, defendant's former attorney, Zuganelis, testified at the trial that he saw red and blue marks on defendant's upper body during the time that defendant was still in police custody.

*People v. Durr* (1978), 58 Ill. App. 3d 525, 374 N.E.2d 873, which is the State's case with the closest similarity to the case *sub judice*, is distinguishable because the time lapse between the two incidents was 2½ years and the allegations of abuse involved different officers. The State cites numerous other cases which appear to be factually dissimilar in support of its argument that the testimony of the inmates was irrelevant, collateral and would have confused the jury.

Whether what is offered as evidence is admitted or excluded depends upon whether it tends to make the question of guilt more or less probable. A trial court may reject offered evidence on the grounds that it is irrelevant and has little probative value due to its remoteness, uncertainty, or prejudicial nature. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696; *Banks*, 192 Ill. App. 3d at 994.) Although the evidence supporting the relevancy of the witnesses' testimony is not as strong in the case *sub judice* as it was in *Banks*, I cannot say that the testimony defendant sought to present was irrelevant or of little probative value. Accordingly, it was error to exclude it. Because the confession constituted most of the evidence implicating defendant, the error cannot be said to be harmless.